2006 OK CR 19

**Kenneth Eugene HOGAN, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2003–610.**

Court of Criminal Appeals of Oklahoma.

May 15, 2006.

Order Granting Rehearing and Denying Recall of Mandate
June 28, 2006.

909

914

Catherine Hammarsten, Anthony McKesson, Assistant Public Defenders, Oklahoma City, OK, attorneys for defendant at trial.

Sandra Elliott, Suzanne Gump, Assistant District Attorneys, Oklahoma City, OK, attorneys for the State on trial.

Carolyn L. Merritt, Assistant Public Defender, Oklahoma City, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer J. Dickson, Preston Saul Draper, Assistant Attorneys General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

JOHNSON, Judge.

¶1 Kenneth Eugene Hogan, Appellant, was tried by jury in the District Court of Oklahoma County, Case No. CRF–88–646, and convicted of First Degree Murder. The jury fixed Hogan's punishment at death and the trial court sentenced Hogan accordingly. Hogan appealed his Judgment and Sentence to this Court and we affirmed. *Hogan v. State*, 1994 OK CR 41, 877 P.2d 1157.[1] The United States Supreme Court denied Hogan's petition for certiorari, *Hogan v. Oklahoma*, 513 U.S. 1174, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995), and we denied Hogan's application for post-conviction relief, *Hogan v. State*, Case No. PCD–95–1337 (Dec. 19, 1996)(not for publication).

¶2 Hogan thereafter sought federal habeas corpus review in the United States District Court for the Western District of Oklahoma. The district court denied relief and Hogan appealed. The Tenth Circuit reversed and remanded the matter for a new trial, finding that Hogan's due process rights were violated by the trial court's refusal to instruct the jury on first degree manslaughter. *Hogan v. Gibson*, 197 F.3d 1297, 1312 (10th Cir.1999). Hogan's case was retried March 24 through April 4, 2003 before the Honorable Tammy Bass–Jones. The jury convicted Hogan of First Degree Murder and fixed punishment at death after finding the murder was especially heinous, atrocious, or cruel. The trial court sentenced Hogan to death and he appeals.

## I. FACTS

¶3 Kenneth Hogan and Lisa Stanley had known each other well for several years before Hogan killed her on January 28, 1988 during an afternoon visit to her apartment. She had taken care of his children; he had helped her with schoolwork. Even after her marriage to George Stanley he visited her often in her apartment. There was speculation at trial that their relationship was a romantic one, but no evidence of intimacy. Hogan said he had thought of her as a sister.

¶4 George Stanley testified that the morning of January 28 had been an ordinary one for the couple. He and Lisa had sorted laundry, eaten lunch, and smoked a pipe-full of marijuana before he left for work before noon. When he returned home that evening, he found his apartment in a shambles and his wife's body on the floor of the living room.

¶5 Lisa Stanley had been stabbed 25 times with a large knife. She suffered wounds to her head, neck, chest, back, and throat. Any one of several wounds would have caused her death quickly. Bloodstain pattern analysis showed the stabbing had begun in the kitchen, the victim had been upright and moving for a period of time during the attack, and the deepest wounds had been inflicted in the living room where the body was found.

¶6 Within a week, Hogan confessed during an interview with Oklahoma City Police Department Detective Bob Horn that he had killed Lisa Stanley. The State introduced a tape recording of that confession and played it for the jury. Later, the defense introduced a transcription of the same recording. Hogan told Detective Horn that on January 28th he lied to his wife saying he was going to find work, but instead had gone to Lisa's apartment to help her with a book report for school. They smoked "some stuff," got high and "smoked some more." Trouble began when Lisa insisted he steal a Pioneer stereo for her. He refused and they argued.

¶7 According to his statement, the trouble escalated when Hogan, angry, prepared to leave. Lisa told him the neighbors could hear through the walls and threatened to scream that he was raping her. She locked herself in the bathroom. He kicked the door in and threatened to tell her mother and her husband secrets about certain incidents in

1. Hogan filed his Petition in Error on December 1, 2003. Hogan's Brief in Chief was filed on July 26, 2004. The State's brief was filed on November 23, 2004. This Court heard oral argument on August 23, 2005.

her past. She went to the kitchen, returning with a butcher knife which she "pushed" at him. He grabbed the blade while she pulled the knife back cutting his hand. Hogan told the detective he "just knew that she was gonna tell the Police that I'd tried to rape her,...."

¶ 8 The interview continued:

HORN: What'd you do, KEN?

HOGAN: I killed her.

HORN: For the purposes of this report KEN tell me ... tell me what happened.

HOGAN: It hurts, too much ...

HORN: How did you kill her?

HOGAN: With the knife she cut me with and it wasn't ... it was like I wasn't even there ... just somebody else ... it wasn't even me ...

HORN: What were they doing ... what's this person doing KEN?

HOGAN: It was stabbing her and I couldn't stop him ... that's right ... I just went over to be friends, I didn't come over there to do any harm and now I've got to pay ... it's not fair.

¶ 9 After the stabbing Hogan remained in the apartment and spent some time arranging things to look as if someone else had been "fighting" with Lisa. He tipped over the television, emptied the contents of her purse out "to make it look like someone was looking for stuff" and took the bathroom rug, stained with his blood, away to be burned.

¶ 10 His decision to confess was not immediate. There was testimony that after he left the apartment, Hogan drove to an emergency room for treatment of his cut hand. There he gave several stories about the cause of his injury. Later he asked his wife to tell the police he had been home and had injured himself in the garage. She testified to that conversation.

¶ 11 At trial, there was no dispute that Ken Hogan had killed Lisa Stanley. The salient question for the jury during first stage was whether Hogan had acted with the deliberate intent to take away her life or in a heat of passion.

## 1. JURY SELECTION ISSUES

### A.

¶ 12 In Proposition VII, Hogan claims several rulings made by the trial court during jury selection denied him his right to a fair and impartial jury. First, he claims that the trial court erred in refusing to allow defense counsel to inquire of a prospective juror whether she could consider other forms of homicide supported by the evidence. Hogan maintains the purpose of counsel's question was to determine whether prospective jurors could consider his heat of passion defense. Without this information, he contends, defense counsel could neither ascertain grounds to dismiss a prospective juror for cause, nor intelligently exercise peremptory challenges. We disagree.

¶ 13 The manner and extent of *voir dire* questioning is discretionary with the trial court. Its rulings will not be disturbed on appeal unless the court's decision was clearly erroneous or manifestly unreasonable. *Lott v. State*, 2004 OK CR 27, ¶ 96, 98 P.3d 318, 344; *Black v. State*, 2001 OK CR 5, ¶ 15, 21 P.3d 1047, 1057. To facilitate jury selection, the trial court may restrict questions that are repetitive, irrelevant or in regard to legal issues upon which the trial court will instruct the jury. *Black*, 2001 OK CR 5, ¶ 15, 21 P.3d at 1057. "No abuse of discretion will be found so long as the voir dire questioning is broad enough to afford the defendant a jury free of outside influence, bias or personal interest." *Id.*

¶ 14 This Court has upheld trial courts who restrict defense theory questions posed to prospective jurors when the questions seek to test prospective jurors' willingness to accept the accused's theory of defense rather than to test their impartiality. *Black*, 2001 OK CR 5, ¶ 19, 21 P.3d at 1058; *Jackson v. State*, 1998 OK CR 39, ¶ 12, 964 P.2d 875, 883. Here defense counsel asked the prospective juror "[i]f the Court ... were to give you instructions that encompass homicides that are not intentional homicides, would you be willing to consider those instructions?" The trial court sustained the State's objection.

¶ 15 The question posed here is somewhat different from the questions condemned in *Black* and those disallowed in *Jackson*. But as the *Jackson* court stated, "[w]e are not interested in whether or not a certain question was allowed to be asked, but rather whether the defendant was allowed sufficient voir dire to determine if there were grounds to challenge a particular juror for cause and to intelligently exercise his preemptory (sic) challenges." *Jackson*, 1998 OK CR 39, ¶ 11, 964 P.2d at 883. Defense counsel here was permitted to ask prospective jurors whether they believed that everyone who kills someone does so intentionally. Defense counsel was allowed to question prospective jurors about whether they could consider all the court's instructions regarding the evidence of intent, and to ask questions testing whether the jurors would listen to both sides of the case and consider all the evidence before rendering a verdict. The questioning here was broad enough to meet constitutional requirements and no relief is required.

### B.

¶ 16 Hogan also claims the trial court erred in excusing thirteen prospective jurors for cause without determining whether they could sufficiently set aside their opposition to the death penalty and consider all three available punishment options, including the death penalty.

¶ 17 A prospective juror should be excused for cause when his views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with the court's instructions and jurors' oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *Young v. State*, 2000 OK CR 17, ¶ 23, 12 P.3d 20, 32. Prospective jurors must not be irrevocably committed to any one punishment option before trial has begun and they must be willing to consider all the penalties provided by law. *Id.* In *Allen v. State*, we stated:

> [N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

1994 OK CR 13, ¶ 23, 871 P.2d 79, 90–91 (citations omitted). The wrongful exclusion of an eligible juror in a capital case based solely upon that juror's opposition to the death penalty can never constitute "harmless error." *See Gray v. Mississippi*, 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622 (1987); *DeRosa v. State*, 2004 OK CR 19, ¶ 36, 89 P.3d 1124, 1140, n. 78.

¶ 18 The thirteen prospective jurors identified by Hogan were all examined by the trial court and the parties. Each of them stated unequivocally that under no circumstances would they impose the death penalty. One of the prospective jurors went further, saying that he could not sit in judgment of another under any circumstances. When questioned by defense counsel all of these prospective jurors affirmed that deeply held beliefs against the death penalty prevented them from considering it. Based on this record we find the trial court did not abuse its discretion in removing these jurors for cause.

### C.

¶ 19 Hogan's third claim is that the trial court erred in refusing his request to excuse five jurors for cause. The record shows that Hogan used five of his peremptory challenges to remove these jurors and they did not serve. The record further shows that Hogan waived two of his nine peremptory challenges. Failure to use all peremptory challenges allotted waives any objection to the final composition of the jury. *See Ross v. Oklahoma*, 487 U.S. 81, 87–90, 108 S.Ct. 2273, 2278–79, 101 L.Ed.2d 80, (1988) (requiring defendants to exercise peremptory challenges to cure the trial court's erroneous ruling on a challenge for cause and holding any error stemming from a trial court's erroneous ruling on a cause challenge is "grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him."); *see also Battenfield v. State*, 1998 OK CR 8, ¶ 20 n. 29, 953 P.2d 1123, 1129 n. 29. Because

Hogan failed to use all of his peremptory challenges and does not argue that he was forced to keep an unacceptable juror, he cannot succeed on this claim.

## III. FIRST STAGE ISSUES

### A.

¶ 20 In Proposition II, Hogan claims his first degree murder conviction must be modified to first degree manslaughter because the State failed to prove beyond a reasonable doubt that he killed Stanley with malice aforethought. Before reaching the merits of this claim, we must determine the proper standard of review. Because the prosecution used only circumstantial evidence to prove he killed with malice aforethought, Hogan claims this Court should use the "reasonable hypothesis" standard.[2] While Hogan acknowledges this Court's holding in *Easlick v. State*, 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559 rejecting the reasonable hypothesis test, he claims it remains the proper standard in cases where the evidence of intent was proved by circumstantial evidence only.

¶ 21 In *Easlick* we abandoned the "reasonable hypothesis" test and stated we would review all future sufficiency claims under the *Spuehler* standard, whereby the appellate court reviews a defendant's appeal of the sufficiency of the trial evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *See Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04 *quoting Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct.

2781, 2787, 61 L.Ed.2d 560 (1979). Contrary to Hogan's claim that *Easlick* was not retroactive by its terms and should not be applied to cases tried prior to the decision, the language in *Easlick* clearly expressed this Court's intent to apply the *Spuehler* standard in all cases reviewed on appeal post *Easlick.* The retroactive application of a standard of review does not run afoul of any of Hogan's constitutional rights. *Easlick* did not carve out a "state of mind" exception and we are unpersuaded to do so now.

¶ 22 Applying the *Spuehler* standard to the evidence here, we find a rational trier of fact could have found Hogan acted with malice aforethought beyond a reasonable doubt when he stabbed Stanley twenty-five times. Hogan admitted he stabbed Stanley multiple times. The evidence showed that Hogan began his knifing of Stanley near the kitchen, following her into the living room where he cut her throat, severing the carotid arteries on the left side of her neck. The jury rejected Hogan's heat of passion defense and his claims that he "lost it" and was not in control. The manner of the killing and the pattern of the wounds support a finding that Hogan intended to kill Stanley. *See Cruse v. State*, 2003 OK CR 8, ¶ 5, 67 P.3d 920, 922. This claim is denied.

### B.

¶ 23 In Proposition III, Hogan claims the three references made to his previous trial prejudiced him.[3] Hogan contends informing the jury that he had been previously tried for this crime diminished jurors' sense of responsibility in their decision-mak-

---

2. Under the reasonable hypothesis standard, this Court would review the evidence in the light most favorable to the State to determine whether the circumstantial evidence ruled out all reasonable hypotheses except that Hogan acted with malice aforethought.

3. The first reference occurred when defense counsel asked Tiffany Harrington whether this was the first time she testified regarding this incident. Harrington answered, "Except for the first trial." The next instance occurred during the prosecution's cross-examination of a defense witness. The prosecutor asked, "In fact, at the prior trial, you and I spoke, did we not?" Defense counsel objected, moved for a mistrial but

did not ask the trial court to admonish the jury. The trial court sustained the objection, but denied the motion for a mistrial. The final instance occurred during second stage when Investigator Bud Argo testified that he did not think he could identify Hogan. The prosecutor refreshed Argo's memory with the transcript from Hogan's first trial, reading the portion where Argo identified Hogan and asking Argo if he recalled his testimony. Argo stated, "Yes, that was in the first trial." Defense counsel asked for a second stage mistrial. The trial court admonished the prosecutor to couch her questions requiring only a yes or no response and denied Hogan's motion for a mistrial.

ing responsibilities because they would reason that he had already been convicted once before of first degree murder.

¶ 24 In *Romano v. State*, 1995 OK CR 74, 909 P.2d 92, we addressed an almost identical claim. The *Romano* court held two references to the defendant's prior trial constituted error and a violation of 21 O.S.1991, § 951, but concluded the error was harmless. *Romano*, 1995 OK CR 74, ¶¶ 51–52, 909 P.2d at 115. The *Romano* court found the error harmless given the strength of the evidence against the defendant and the fact that the jury was aware that there had been prior proceedings and hearings in the case despite the references. *Id.*

¶ 25 As was true in *Romano*, Hogan's jury was well aware that prior proceedings had taken place because some of the testimony was presented by reading a transcript from Hogan's prior trial. Transcripts from Hogan's first trial were also used to question and impeach some of the witnesses. The error here was also mitigated by the trial court's instructions that correctly informed the jury of its role and duty in this case. The trial court instructed the jurors they were the sole judges of the evidence and that they should not surrender their own judgment, but base their decision on the evidence presented during trial. These circumstances where evidence of guilt was strong dictate a finding that the error was harmless.

¶ 26 It is not clear how a reference in the second stage to Hogan's prior trial could have influenced the jury's sentencing decision. The jury was never told that Hogan had been previously sentenced to death and that the sentence had been reversed. This jury was properly instructed regarding punishment. We can find no reason to believe that the isolated reference to a prior trial in second stage diverted the jury from its "awesome responsibility" of deciding the appropriate punishment. *See Bland v. State*, 2000 OK CR 11, ¶ 106, 4 P.3d 702, 729. The error, if any, was harmless.

**C.**

¶ 27 In Proposition IV, Hogan claims the admission of several photographs violated his right to due process and the Ex Post Facto Clause of both the federal and state constitutions. The State introduced fifty-two photographs during both stages of trial: twenty-eight crime scene photographs; eighteen photographs depicting Stanley's body at the crime scene, five of Stanley taken at the medical examiner's office and one "in life" graduation photograph. The photographs introduced during first stage will be considered here and the second stage photographs, including the "in life" graduation photograph, will be considered with second stage issues.

¶ 28 Defense counsel moved in limine to exclude the crime scene photographs, arguing any probative value of the photos was far outweighed by the danger of unfair prejudice. Defense counsel objected at trial to State's Exhibits 4 and 19 because Stanley's wedding pictures were visible in the background of the photograph of her body. Defense counsel further objected to the admission of State's Exhibits 14 and 17 arguing those photos were unfairly prejudicial and to the admission of State's Exhibits 15 and 16 because they were duplicative of State's Exhibit 14. Defense counsel did not object to State's Exhibits 3, 6, 11, 12 and 18. The trial court overruled each of Hogan's objections.

¶ 29 The decision to admit photographs is discretionary with the trial court and will not be reversed on appeal unless clearly erroneous or manifestly unreasonable. *Lott v. State*, 2004 OK CR 27, ¶ 96, 98 P.3d 318, 344; *Lockett v. State*, 2002 OK CR 30, ¶ 19, 53 P.3d 418, 425. Photographs are admissible if they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence. *Lockett*, 2002 OK CR 30, ¶ 19, 53 P.3d at 425; 12 O.S.2001, §§ 2402–2403.

¶ 30 Only eleven photographs depicting Stanley at the crime scene were introduced during the first stage.[4] These photographs were probative because they

---

4. The State showed photographs of Stanley in State's Exhibits 42–44, 65–70, and 90–91 to the medical examiner during first stage, but did not introduce these exhibits until second stage.

assisted the jury in understanding the crime scene reconstructionist's testimony, assisted the jury in understanding the State's theory of how the crime occurred and corroborated parts of Hogan's confession. The fact that State's Exhibits 4 and 19 show Stanley's wedding pictures in the background does not cause the photographs to be substantially more prejudicial than probative; the photos showed the location of Stanley's body in her home where she was killed surrounded, as one would expect, by her household possessions.

◼ ¶ 31 We recognize that the challenged photographs may be disturbing to the sensibilities of a normal person. Each of the photographs, however, showed a different aspect of the crime scene or a view of different wounds Stanley sustained. Their probative value was not substantially outweighed by the danger of needless presentation of cumulative evidence. Nor were the photos unfairly prejudicial. The photos show the crime scene, the victim, and the wounds she sustained during her attack. They do not depict the work of a medical examiner as an autopsy photograph might, nor are they gratuitously shocking. These pictures depict the killer's handiwork. It did not violate due process to show them to Hogan's jury. *See DeRosa v. State,* 2004 OK CR 19, ¶ 73, 89 P.3d 1124, 1150.

### D.

◼ ¶ 32 In Proposition VI, Hogan claims he was denied a fair trial by the admission of a privileged communication with his wife Tiffany shortly after Stanley's death. The conversation consisted of Hogan asking Tiffany to lie and provide him with an alibi for the day Stanley was killed by supporting his claim to police that he was home with her that day and that he cut his hand in the garage.[5] Because he never intended for Tiffany to reveal that he told her to lie to the police and counted on her to support his alibi based on their marital relationship, he claims that part of the conversation was privileged. Before Tiffany testified, defense counsel objected to her testimony, asserting Hogan's marital privilege.[6] The trial court overruled Hogan's objection finding the content of the conversation was intended to be repeated to third parties and was therefore not privileged. The court admitted the conversation between Hogan and his wife as proof of consciousness of guilt.

¶ 33 In 1978, the Oklahoma legislature enacted the Oklahoma Evidence Code [hereinafter Code], which states that every person is competent to be a witness and that no person can refuse to be a witness and disclose information unless authorized by law. 12 O.S. 2001, §§ 2501 and 2601.[7] The legislature codified a confidential marital communication

---

5. The prosecutor asked Hogan's former wife during trial:

Q. (Prosecutor) At some point prior to going to the police department and after the police had called to try to question your husband, did you and he have some discussion about what to say to the police?
A. (Tiffany Hogan Harrington) Yes.
Q. Okay. Can you please describe that for us?
A. To tell them that he was home all day?
Q. Okay. And what did he tell you to tell them about the injury to his hand?
A. That he had cut a hose in the garage.
Q. Okay. And did you do that?
A. Yes.
Q. So you told that to the police when they first questioned you?
A. Yes.
Q. It is a certain fact that at some point during your interview with the detectives you told them that that, in fact, was not true?
A. Yes.
Q. And do you recall at what point it was during the interview that you told them the

truth that Mr. Hogan had not, in fact been at home?
A. Yes.
Q. And did you tell the police everything that Mr. Hogan had said to you that he intended for you to convey to the police officers?
A. Yes.
(Tr.6 at 188–89)

6. Defense counsel first objected to testimony about the conversation between Hogan and his wife during the State's opening statement.

7. Section 2501 provides in part:

*Except as otherwise provided by constitution, statute or rules promulgated by the Supreme Court no person has a privilege to:*
1. *Refuse to be a witness;*
2. *Refuse to disclose any matter.*
Section 2601 provides that every person is competent to be a witness except as otherwise provided in the Oklahoma Evidence Code, 12 O.S. 2001, §§ 2101 *et seq.*

privilege in the Code known as the "Husband–Wife Privilege."[8]

¶ 34 The husband-wife privilege precludes a spouse from testifying in a criminal proceeding as to any confidential communication between the accused and the spouse. 12 O.S.2001 § 2504(B). A communication is confidential and therefore privileged if it is made privately by any person to that person's spouse, and the content of the conversation is not intended for disclosure to any other person. 12 O.S.2001, § 2504(A). A person waives the privilege if he voluntarily discloses or consents to disclosure of any "significant" part of the privileged matter. 12 O.S.Supp.2002, § 2511.

¶ 35 This Court has not defined "significant" for purposes of determining when the holder of a privilege has waived it by disclosing a part of an otherwise privileged communication to a third party. Wigmore would find voluntary testimony concerning a part of any communication waives the privilege as to the whole of the communication. 8 Wigmore on Evidence, § 2327 at 638; § 2340 at 671–72. Whinery finds that § 2511 is more flexible and "provides a standard within which a court may exercise its discretion depending upon the facts of the particular case and the objectives to be achieved by the privilege in question." Oklahoma Evidence, vol. 2, Whinery, § 35.13 at 764. We agree with the Whinery approach. Courts should consider the facts of the particular case and the objectives of the particular privilege in

judging whether the holder of a privilege has disclosed a significant part of a privileged matter so as to waive the privilege as to the whole communication.

¶ 36 Considering the confidential communication at issue here and the objectives of the husband-wife privilege, we find Hogan disclosed and consented to disclosure of a significant part of the conversation he had with his wife when both he and his wife told police the alibi he contrived. By voluntarily disclosing and consenting to disclosure of a significant part of the confidential conversation he had with his wife, Hogan waived the husband-wife privilege as to the entire conversation and the trial court did not err in admitting Tiffany's testimony concerning it. 12 O.S.Supp.2002, § 2511.

## IV. FIRST STAGE INSTRUCTIONS

### A.

¶ 37 In Proposition I, Hogan challenges the trial court's first stage jury instructions submitting heat of passion manslaughter as a lesser included offense. He claims the jury instructions were erroneous and denied him due process because the instructions did not inform the jury that the State had to disprove his affirmative defense and prove the absence of heat of passion beyond a reasonable doubt. Hogan also claims the trial court's instructions were constitutionally deficient because the instructions did not adequately inform the jury that heat of passion

---

8. At the same time the legislature enacted the Code, it repealed the Code of Civil Procedure's privilege of spousal immunity, also known as spousal disqualification, that forbids a spouse from being a witness against the other. *See* 12 O.S., § 385(3) (providing that husbands and wives were incompetent to be witnesses for or against each other except concerning transactions in which one acted as the agent of the other or when they were joint parties and had a joint interest in the action.) Section 385 also contained a broad confidential marital communication privilege. The legislature repealed the Code of Criminal Procedure's privilege of spousal immunity four years later. *See* 22 O.S., § 702 (providing "neither husband nor wife shall in any case be a witness against the other except in a criminal prosecution for a crime committed one against the other, or except in a criminal prosecution against either the husband or the wife, or both, for a felony committed by either,

or both, against the minor children of either the husband or the wife, but they may in all criminal cases be witnesses for each other, and shall be subject to cross-examination as other witnesses, and shall in no event on a criminal trial be permitted to disclose communications made by one to the other except on a trial of an offense committed by one against the other or except on a trial of a felony committed by one, or both, against the minor children of either the husband or the wife.") Prior to the adoption of the Code, § 702 made it clear that in all but a very narrow range of circumstances the marital privilege could be invoked to prevent one spouse from testifying against the other. *Lavicky v. State,* 1981 OK CR 87, ¶ 6, 632 P.2d 1234, 1236. In contrast, the Code "limits the marital privilege, in criminal cases, to 'confidential communications.'" *Id. See also* Evidence Subcommittee's Note to 12 O.S., § 2504.

was his defense or adequately distinguish between the different mental states of murder and manslaughter. Hogan acknowledges that *Black v. State*, 2001 OK CR 5, ¶¶ 42–49, 21 P.3d 1047, 1064–67, held the uniform instructions sufficiently distinguish between the mental states of murder and manslaughter, adequately allocate the burden of proof and allow the jury to properly consider the manslaughter evidence even in those instances where the defendant's defense is heat of passion and manslaughter is submitted as a lesser included offense. Hogan maintains, however, that *Black* is not controlling here because the trial court did not use the uniform instructions and the instructions given failed to adequately instruct the jury on how to evaluate and consider the offense of heat of passion manslaughter.

■■■ ¶ 38 Hogan did not object to the trial court's manslaughter instructions on this basis; his failure to do so forfeits any error unless he can show plain error. *See Norton v. State*, 2002 OK CR 10, ¶ 17, 43 P.3d 404, 409; 20 O.S.2001, § 3001.1. To be entitled to relief under the plain error doctrine, Hogan must prove: 1) the existence of an actual error (i.e., deviation from a legal rule); 2) that the error is plain or obvious; and 3) that the error affected his substantial rights, meaning the error affected the outcome of the proceeding. *See Simpson v. State*, 1994 OK CR 40, ¶¶ 3, 11, 23, 876 P.2d 690, 694, 695, 698; 20 O.S.2001, § 3001.1. If these elements are met, this Court will correct plain error only if the error "seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings" or otherwise represents a "miscarriage of justice." *Simpson*, 1994 OK CR 40, ¶ 30, 876 P.2d at 701 (citing *United States v. Olano*, 507 U.S. 725, 736, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993); 20 O.S.2001, § 3001.1.

■■■ ¶ 39 The first step in plain error analysis is to determine whether error oc-

curred. It is settled law that trial courts have a duty to instruct the jury on the salient features of the law raised by the evidence with or without a request. *Atterberry v. State*, 1986 OK CR 186, ¶ 8, 731 P.2d 420, 422 citing to *Wing v. State*, 1955 OK CR 29, ¶ 34, 280 P.2d 740, 747. Jury instructions are sufficient if when read as a whole they state the applicable law. *McGregor v. State*, 1994 OK CR 71, ¶ 23, 885 P.2d 1366, 1380.

¶ 40 Hogan did not dispute that he killed Stanley. He defended the first degree murder charge by attempting to convince the jury that he did not kill Stanley with a deliberate intent but rather acted in a heat of passion. Based on his defense, he asked the trial court to give the uniform instructions on heat of passion manslaughter as a lesser included offense. The trial court gave the uniform manslaughter instructions, submitting the manslaughter offense as a lesser included offense as Hogan requested. The Court deviated from the uniform instructions relating to the jury's consideration of lesser included offenses and crafted its own.[9] These instructions about which Hogan complains were based largely on instructions he proposed.[10] The question we must answer is whether the trial court's instructions adequately stated the applicable law.

■■■ ¶ 41 "Legal defenses are matters which go to the legal exoneration of guilt or evidence which may reduce the charge to a lesser included offense." *Kinsey v. State*, 1990 OK CR 64, ¶ 9, 798 P.2d 630, 633. This Court often refers to these legal defenses as affirmative defenses. In some jurisdictions, the defendant bears not only a burden of production for his affirmative defense but a burden of persuasion. *See Patterson v. New York*, 432 U.S. 197, 200–01, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281 (1977). In Oklahoma, a defendant's only burden is to raise a reasonable doubt of his guilt. *Merriweather v. State*, 53 Okla.Crim. 420, 12 P.2d 707, 708

9. Instruction No. 13 substantially sets forth the procedure contained in the uniform instructions for consideration of lesser included offenses. It properly informed the jury of the punishment range for manslaughter and that the issue of punishment for first degree murder was not before the jury at that time.

10. Hogan's requested instructions on manslaughter as a lesser included offense were filed and the record shows the trial court included them all in its instructions, rearranging the order of a few sentences and paragraphs concerning how to consider lesser included offenses.

(1932); *McClatchey v. State*, 12 Okla.Crim. 173, 152 P. 1136, 1137 (1915). Once a defense is raised the defendant is entitled to an instruction on his theory of defense and the burden of persuasion never shifts to the defendant. *Kinsey*, 1990 OK CR 64, ¶ 9, 798 P.2d at 633; *Merriweather*, 12 P.2d at 708; *McClatchey*, 152 P. at 1137. The burden of persuasion remains on the State to prove each element of the crime charged beyond a reasonable doubt and thus to prove beyond a reasonable doubt the absence of any affirmative defense raised.[11] *See Striplin v. State*, 1972 OK CR 175, ¶ 13, 499 P.2d 446, 449.

¶ 42 Hogan's jury was instructed that the State was required to prove each element of first degree murder beyond a reasonable doubt and that Hogan could not be convicted of that offense unless the State had met its burden. The jury was similarly instructed that it could not convict Hogan of heat of passion manslaughter unless the State had proved the elements of that offense beyond a reasonable doubt. These instructions when read as a whole required the State to prove Hogan acted with deliberate intent in killing Lisa Stanley, and, consequently, required the State to prove the absence of any other mental state. The trial court's instructions neither presumed any element nor required Hogan to prove any element in order to reduce the crime to manslaughter.[12]

¶ 43 The instructions were sufficiently clear in explaining the difference between the mental state required for first degree murder and the mental state required for manslaughter. As we stated in *Black*:

> The use of "deliberate intent" in the definition of malice in Oklahoma connotes an intent that is thought out or considered before commission of the fatal act, rather than some undefined condition of the mind or heart. Because heat of passion requires the defendant to act on the force of a strong emotion following adequate provocation that would naturally affect the ability to reason and render the mind incapable of cool reflection, i.e., not with a deliberate intent pre-formed, the Oklahoma definitions of malice and heat of passion show they cannot co-exist. Although the instructions in the instant case do not specifically state these mental states cannot co-exist ..., the definitions employed to define the mental states of murder and heat of passion manslaughter sufficiently informed the jury that the differing mens rea elements were mutually exclusive.

\* \* \*

Although the instructions administered advised the jury procedurally to consider murder first and only if it had a reasonable doubt as to the proof of murder then to consider manslaughter, other instructions dictated that the jury consider Appellant's heat of passion evidence in determining if Appellant possessed a deliberate intent when he stabbed Pogue. Specifically, in its consideration of the murder elements, the jury was instructed to consider the

---

11. This burden is reflected in the uniform instructions on defenses. *See* OUJI–CR2d 8–5 (burden of proof for defense of another); OUJI–CR2d 8–17 (burden of proof for defense of property); OUJI–CR2d 8–22 (burden of proof for duress); OUJI–CR2d 8–26 (burden of proof for entrapment); OUJI–CR2d 8–30 (burden of proof for excusable homicide); OUJI–CR2d 8–33 (burden of proof for insanity); OUJI–CR2d 8–38 (burden of proof for voluntary intoxication); OUJI–CR2d 8–44 (burden of proof for involuntary intoxication); and OUJI–CR2d 8–49 (burden of proof for self-defense).

12. These instructions satisfy *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970)(holding that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged).

*Cf. Patterson*, 432 U.S. at 214–16, 97 S.Ct. at 2329–30 (holding Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the charged offense and New York law that requires the defendant in a second degree murder prosecution to prove by a preponderance of the evidence the affirmative defense of extreme emotional disturbance in order to reduce the crime to manslaughter when no element of the charged offense is presumed does not violate the Due Process Clause); *Mullaney v. Wilbur*, 421 U.S. 684, 703–04, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975) (holding State must prove every element of an offense beyond a reasonable doubt and a scheme that shifts the burden of proof to the defendant by presuming a fact upon proof of the other elements of the offense violates due process).

external circumstances surrounding the commission of the homicidal act to determine if Appellant possessed a deliberate intent to take a human life. Such external circumstances included Appellant's "words, conduct, demeanor, motive, and all other circumstances connected" with the fatal stabbing of Pogue. Therefore, based on the instructions administered, we find Appellant was not deprived of having the jury consider his heat of passion defense in tandem with the murder charge. As such, we find the instructions administered in this case were constitutionally adequate to ensure that the appropriate burdens of proof were allocated to the parties and that the jury was free to consider Appellant's defense.

*Black,* 2001 OK CR 5, ¶¶ 48 and 49, 21 P.3d at 1066–67.

¶ 44 The trial court in this case gave the same substantive instructions given in *Black* on first degree murder and heat of passion manslaughter, including all of the definitions provided in the uniform instructions. These instructions when read as a whole sufficiently state the applicable law of this case as they

did in *Black.*[13] For that reason, Hogan cannot show plain error.

¶ 45 Any objections Hogan had to the format of the instructions or the order in which they were presented required his objection and submission of alternative instructions. Not only did he fail to object to these particular instructions, they were given at his request.[14] Any error that may have occurred here was error invited by Hogan. The trial court gave, almost verbatim, Hogan's proposed instructions.[15] Reversal cannot be based on such an error. *See Lynch v. State,* 1995 OK CR 65, ¶ 7, 909 P.2d 800, 802 ("[w]e will not allow [a]ppellant to invite error and then complain of the same"); *Pierce v. State,* 1990 OK CR 7, ¶ 10, 786 P.2d 1255, 1259–60 (holding that defendant may not complain of error he invited, and further holding that reversal cannot be based on such error).

## B.

¶ 46 In Proposition V, Hogan argues that the trial court's refusal to give his requested instruction on the "exculpatory statement doctrine"[16] violated due process

13. The dissent contends the Court here upholds an infirm verdict resting on faulty jury instructions. The dissent maintains, contrary to this Court's holding in *Black,* that the mental states of malice aforethought and heat of passion are not sufficiently distinguished by the uniform instructions. And therefore, due process requires an instruction informing the jury that the State must disprove the heat of passion manslaughter defense even when the defendant has requested the court submit heat of passion manslaughter as a lesser included offense. Malice aforethought murder requires the defendant not only intend to kill but form a *deliberate* intention to take away the life of another person. OUJI–CR2d 4–62. A deliberate act is one that requires a cool mind that is capable of reflection. Heat of passion manslaughter, on the other hand, is a homicide committed by a person who is incapable of that cool reflection called for by the requirement of deliberation because of intense emotion caused from actions of the victim. OUJI–CR2d 4–95, 4–97, 4–98, 4–99, 4–100 and 4–101. It is the provocation of the deceased that causes the passion or emotion of the defendant and it is that passion or emotion that causes the defendant to perpetrate the act which results in death. OUJI–CR2d 4–101. Acting in the heat of passion need not overcome the killer's reason or destroy free exercise of choice; rather the sudden passion precludes deliberation and causes the killer to act.

14. As we stated in *Black,* "[t]hat is not to say more specific instructions, if requested, [setting forth heat of passion manslaughter as a defense rather than a lesser included offense] are not desirable." *Black,* 2001 OK CR 5, ¶ 48 n. 17, 21 P.3d at 1067 n. 17.

15. *See* note 10, *supra.*

16. The "exculpatory statement doctrine" states:
 An exculpatory statement is defined as a statement by the defendant that tends to clear a defendant from alleged guilt, or a statement that tends to justify or excuse **his/her** actions or presence.
 Where the State introduces in connection with a confession or admission of a defendant an exculpatory statement, which, if true, would entitle **him/her** to an acquittal, **he/she** must be acquitted unless such exculpatory statement has been disproved or shown to be false by other evidence in the case. The falsity of an exculpatory statement may be shown by circumstantial as well as by direct evidence.
 A statement is exculpatory within the meaning of this instruction only if it concerns a tangible, affirmative, factual matter capable of specific disproof. A statement is not exculpatory within the meaning of this instruction if it merely restates the defendant's contention of innocence.

and his right to present his defense. We review the trial court's ruling denying Hogan's requested instruction for an abuse of discretion. *Kinchion v. State,* 2003 OK CR 28, ¶ 14, 81 P.3d 681, 685.

¶ 47 The trial court did not abuse its discretion in refusing to give a jury instruction on exculpatory statements because Hogan's statement to the police was disproved by other evidence in the case. *See Kinchion,* 2003 OK CR 28, ¶ 14, 81 P.3d at 685. Further, Hogan was not prejudiced by the absence of the instruction as the jury was fully instructed on the State's burden of proof, the presumption of innocence, and the voluntariness of his statement. *Id.*

## V. SECOND STAGE ISSUES

### A.

██ ¶ 48 In Proposition VIII, Hogan claims he was denied due process and that the trial court lacked jurisdiction to instruct on the death penalty absent the filing of a new Bill of Particulars for retrial. He maintains that the notice filed by the State could not constitutionally substitute for a new Bill of Particulars. We disagree.

██ ¶ 49 The purpose of filing a Bill of Particulars is to give the defendant notice that the State is seeking the death penalty based on certain identified statutory aggravating circumstances so the defendant can prepare a defense. *See Banks v. State,* 1985 OK CR 60, ¶ 32, 701 P.2d 418, 426. When Hogan's case was reversed and remanded for new trial, jurisdiction of this matter was returned to the district court for retrial on the original Information charging Hogan with First Degree Murder. In lieu of refiling the Bill of Particulars, the State filed a notice seventeen months prior to Hogan's retrial, advising Hogan of its intent to again seek the death penalty. The Notice advised Hogan that the State intended to offer the same Bill of Particulars with the same allegations as the Bill of Particulars contained in the Statement Making More Definite and Certain filed before his first trial. Seventeen months was

sufficient notice to allow Hogan to prepare his defense to the Bill of Particulars. Under these circumstances, the State was not required to file a new Bill of Particulars.

### B.

¶ 50 At the capital sentencing stage of Hogan's first trial, the State introduced evidence of three aggravating circumstances: that Hogan presented a continuing threat; that the murder was especially heinous, atrocious, or cruel; and that Hogan murdered Stanley to avoid arrest or prosecution. The jury unanimously found the second aggravator was proved beyond a reasonable doubt and sentenced Hogan to death. Nothing in the record sheds any light on the jury's treatment of the other two aggravators.

¶ 51 At retrial the State presented evidence of the heinous, atrocious, or cruel and continuing threat aggravators.[17] The second jury, as the first, made no finding of the continuing threat aggravator, but unanimously found the murder was especially heinous, atrocious, or cruel and sentenced Hogan to death.

¶ 52 Hogan argues that the failure of his first jury to unanimously find he presented a continuing threat was an effective acquittal of that aggravator which terminated jeopardy, invoked the protection of the double jeopardy clause, and prohibited the State from charging it again at his second trial. He argues that *Sattazahn v. Pennsylvania,* 537 U.S. 101, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003) requires that holding in this case. We disagree.

██ ¶ 53 In *Poland v. Arizona,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986) the Supreme Court considered "whether the Double Jeopardy Clause bars a further capital sentencing proceeding when, on appeal from a sentence of death, the reviewing court finds the evidence insufficient to support the only aggravating factor on which the sentencing judge relied, but does not find the evidence insufficient to support the death penalty." *Poland,* 476 U.S. at 148, 106 S.Ct.

---

17. The State did not pursue the avoid arrest aggravator at Hogan's retrial.

at 1751. The *Poland* court affirmed the "usual" rule that a capital defendant who obtains reversal of his conviction on appeal has had his original conviction nullified and the slate wiped clean. *Id.* at 152, 106 S.Ct. at 1753. If convicted again, he may be subjected to the full range of punishment provided by law. *Id.* The clean slate rule does not apply, however, if the defendant has been acquitted because the prosecution did not prove its case for the death penalty. *Id.* A defendant is acquitted of the death penalty whenever a jury agrees or an appellate court decides that the prosecution has failed to prove its case for the death penalty. *See Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981)(defendant sentenced to life by a capital sentencing jury has been acquitted of the death penalty and the Double Jeopardy Clause forbids the state from seeking the death penalty on retrial in the event the defendant obtains reversal of his conviction); *Arizona v. Rumsey*, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984)(sentencer's finding, albeit erroneous, that no aggravating circumstance is present resulting in the imposition of a life sentence is an acquittal barring a second capital sentencing proceeding).

¶ 54 The court held in *Poland* that neither the sentencer nor the reviewing court had decided that the prosecution had not proved its case for the death penalty and thus acquitted the petitioners because both had found evidence of an aggravating circumstance.[18] *Poland*, 476 U.S. at 154–55, 106 S.Ct. at 1754–55. The Poland court rejected the argument that a capital sentencer's failure to find a particular aggravating circumstance alleged by the prosecution constitutes an "acquittal" of that circumstance for double jeopardy purposes. Poland, 476 U.S. at 155–56, 106 S.Ct. at 1755. The court refused to "view the capital sentencing hearing as a set of minitrials on the existence of each aggravating circumstance" because aggravating circumstances are not separate penalties or offenses; rather they are the standards that guide the sentencer's choice between the alternative verdicts of death and life imprisonment.[19] *Id.* at 156, 106 S.Ct. at 1755. *Poland* followed the usual rule, holding the State is not barred from seeking the death penalty on retrial of a defendant who has not been acquitted of the death penalty and the State may present evidence of any aggravating circumstance supported by the record.[20]

¶ 55 Nothing in *Sattazahn* abrogates Poland's holding and nothing supports Hogan's

18. The petitioners in Poland were convicted of a double murder arising out of a robbery of a currency courier. *Id.* at 149, 106 S.Ct. at 1752. At the penalty phase, the State sought to prove the existence of two statutory aggravating circumstances to justify imposition of the death penalty: (1) the murder was committed for pecuniary gain; and (2) the murder was especially heinous, cruel or depraved. *Id.* The trial judge, acting as sentencer, rejected the "pecuniary gain" circumstance on the theory that the circumstance required proof of a contract killing and there was no proof of such in the record. *Id.* The trial judge found that the State had proved that the murders were "especially heinous, cruel or depraved," that this circumstance outweighed any mitigating evidence and sentenced the petitioners to death. *Id.*

On appeal, the Arizona Supreme Court reversed the convictions and death sentence finding among other errors that the evidence was insufficient to support the aggravating circumstance that the murders were "especially heinous, cruel or depraved." *Id.* at 150, 106 S.Ct. at 1752. The court held the trial judge erred in finding that the pecuniary gain circumstance was limited to contract killings and therefore the circumstance could be considered on retrial. *Id.*

At retrial, the petitioners were again convicted and sentenced to death. *Id.* The petitioners appealed to the Arizona Supreme Court arguing, inter alia, that the Double Jeopardy Clause barred reimposition of the death penalty because the appellate court had previously acquitted them by finding the evidence insufficient to support the sole aggravator found by the sentencer. *Id.* at 151, 106 S.Ct. at 1753, 90 L.Ed.2d at 129. The Arizona Supreme Court rejected the double jeopardy claim and affirmed the death sentence. *Id.* The United States Supreme Court affirmed the Arizona Supreme Court's decision. *Id.*

19. As under Arizona's capital sentencing scheme, an Oklahoma capital sentencing jury's finding of any particular aggravating circumstance does not of itself "convict" a defendant and require the death penalty, and its failure to find any particular aggravating circumstance does not "acquit" a defendant and preclude the death penalty.

20. The dissent acknowledges that Hogan can prevail only if this Court declines to follow *Poland*.

argument here. Sattazahn argued that his judge-imposed life sentence in lieu of a non-finding of death by his jury was a jeopardy-terminating event. The *Sattazahn* majority disagreed and found that a jury's inability to reach a decision in the penalty phase of a capital trial resulting in the imposition of a statutorily mandated life sentence did not constitute an "acquittal" of the offense the Supreme Court now terms "murder plus aggravating circumstances" sufficient to bar the prosecution from seeking the death penalty again on retrial. *Sattazahn*, 537 U.S. at 112, 123 S.Ct. at 740. The mere imposition of a life sentence is not an acquittal of the death penalty for double jeopardy purposes. To bar the State from seeking the death penalty on retrial, there must be an affirmative decision by the defendant's first jury not to impose a death sentence, *i.e.* an acquittal of the death penalty on the merits. *Id.* at 106–07, 123 S.Ct. at 737. Because Sattazahn's first jury had deadlocked without reaching a decision regarding aggravating circumstances and the trial court thereafter imposed a life sentence, Sattazahn could not establish that the jury had "acquitted" him during his first capital-sentencing proceeding. Consequently, jeopardy had not terminated; *Sattazahn's* successful appeal wiped the slate clean and the state was permitted to seek the death penalty upon retrial. *Sattazahn*, 537 U.S. at 112–13, 123 S.Ct. at 740.

¶ 56 Unlike Sattazahn who appealed a life sentence imposed by a judge by operation of law, Hogan appeals a death sentence imposed by a jury on a verdict of guilty on murder plus aggravating circumstances. By sentencing Hogan to death at his first trial on a finding the murder was especially heinous, atrocious, or cruel, Hogan's jury clearly did not acquit him of murder plus aggravating circumstances. Therefore, he cannot make a claim of entitlement to a life sentence on the basis of either acquittal or operation of law. In the absence of a jeopardy-terminating event entitling him to a life sentence (i.e., acquittal by jury on aggravating circumstances and imposition of life sentence or finding of insufficient evidence by appellate court of all aggravators), retrial for murder plus aggravating circumstances is not barred on double jeopardy grounds.[21]

¶ 57 Contrary to his claim, Part III of the *Sattazahn* opinion (joined by three justices) does not support his position that his first jury effectively acquitted him of the continuing threat aggravator. Part III of that opinion discusses the application of *Apprendi v. New Jersey*[22] and *Ring v. Arizona*[23] in the context of capital sentencing double jeopardy claims.[24] Because aggravating circumstances

---

**21.** The dissent misconstrues our holdings in *Crawford v. State*, 1992 OK CR 62, 840 P.2d 627, 640–41, *Cheney v. State*, 1995 OK CR 72, 909 P.2d 74, and *Perry v. State*, 1995 OK CR 20, 893 P.2d 521, 533–37, and misunderstands the *Sattazahn* distinction between a jury's non-finding of an aggravating circumstance and an acquittal on the merits of murder plus aggravating circumstances that entitles a defendant to a life sentence. *Crawford*, *Cheney*, and *Perry* are examples of cases in which this Court found the state did not prove its case for the death penalty, a finding that constitutes an acquittal of murder plus aggravating circumstances and legally entitled those defendants to life sentences. Contrary to the dissent's claim, these cases do not stand for the proposition that this Court rejected *Poland* in any manner for almost ten years or found that the jury's failure to find a particular aggravator constitutes an acquittal. This point is further supported by the fact that this Court cited *Poland* approvingly in *Romano v. State*, 1995 OK CR 74, ¶ 66–68, 909 P.2d 92, 117–18, a case decided eleven days after *Cheney*.

**22.** 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (holding that if the existence of any fact increases the maximum punishment that may be imposed on a defendant, that fact constitutes an element that must be found by a jury beyond a reasonable doubt).

**23.** 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (holding that Sixth Amendment requires that a jury, not a judge, find the existence of any aggravating circumstance, and that they be found beyond a reasonable doubt). Hogan's aggravators were tried to a jury, not a judge. There is no *Ring* issue here.

**24.** The dissent counts two of the justices joining Part III (Rehnquist, C.J., now deceased, was the third justice joining Part III) and the four dissenters in *Sattazahn* as rejecting the doctrinal basis for the *Poland* decision. This position is not supported by a careful reading of *Sattazahn*. In Part II of the *Sattazahn* decision, five justices spoke approvingly of the so-called *Bullington* line of cases which includes *Poland*:

> Under the *Bullington* line of cases just discussed, the touchstone for double-jeopardy protection in capital-sentencing proceedings is

operate as the functional equivalent of an element of a greater offense, murder is a distinct lesser included offense of murder plus one or more aggravating circumstances. Murder exposes a defendant to a maximum sentence of life imprisonment; murder plus one or more aggravators increases the maximum sentence to death. The Sixth Amendment requires that a jury, not a judge, find the existence of any aggravating circumstances beyond a reasonable doubt. In Part III of *Sattazahn*, a plurality of the court agreed:

> In the post-*Ring* world, the Double Jeopardy Clause can, and must, apply to some capital-sentencing proceedings consistent with the text of the Fifth Amendment. If a jury unanimously concludes that a State has failed to meet its burden of proving the existence of one or more aggravating circumstances, double-jeopardy protections attach to that "acquittal" on the offense of

whether there has been an "acquittal." **Petitioner here cannot establish that the jury or the court "acquitted" him during his first capital-sentencing proceeding. As to the jury:** *The verdict form* **returned by the foreman stated that the jury deadlocked 9–to–3 on whether to impose the death penalty; it** *made no findings with respect to the alleged aggravating circumstance. That* **result—or more appropriately, that** *non-result—cannot fairly be called an acquittal* **"based on findings sufficient to establish legal entitlement to the life sentence."**
*Sattazahn,* 537 U.S. 101 at 109, 123 S.Ct. 732, 154 L.Ed.2d 588 (quoting *Arizona v. Rumsey,* 467 U.S. 203, 211, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984) and referring with approval to *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) and *Poland v. Arizona,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986))(emphasis added).
The *Sattazahn* dissenters grappled with the issue of whether jeopardy is terminated by entry of a state-mandated life sentence when the jury deadlocks on punishment. The dissent here contends that 6 of the *Sattazahn* dissent, when combined with the position of the justices in the Part III plurality, establishes that a capital sentencing proceeding is a mini trial on each individual aggravator and that a jury's failure to find a particular aggravator constitutes an acquittal. In 6, the *Sattazahn* dissent states "[t]his Court has determined ... that for purposes of the Double Jeopardy Clause, capital sentencing proceedings involving proof of one or more aggravating factors are to be treated as trials of separate *offenses,* not mere sentencing proceedings." (*Id.* at 126 n. 6, 123 S.Ct. at 747 n. 6). 6 only

"murder plus aggravating circumstance(s)." Thus, [*Arizona v.*] *Rumsey* [467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984)] was correct to focus on whether a factfinder had made findings that constituted an "acquittal" of the aggravating circumstances; but the reason that issue was central is not that a capital-sentencing proceeding is "comparable to a trial," ... but rather that "murder plus one or more aggravating circumstances" is a separate offense from "murder" *simpliciter.*

*Sattazahn,* 537 U.S. at 112, 123 S.Ct. at 740.[25]

¶ 58 Hogan's first jury found that the murder was especially heinous, atrocious, or cruel and convicted him of murder plus aggravating circumstance(s). Even were we to treat each aggravator as a separate offense as Hogan desires rather than distinguishing as separate offenses murder simpliciter and murder plus aggravating circumstance(s), the only thing we know about Hogan's first jury

acknowledges the Court's post-*Apprendi/Ring* jurisprudence that capital sentencing proceedings involve proof of facts that are functional equivalents of elements of offenses and thus, to that extent, capital sentencing proceedings are to be treated as "trials of separate offenses," the separate offenses being murder plus aggravating circumstances and murder simpliciter. It means only that under *Ring,* capital sentencing proceedings are no longer proceedings in which sentence enhancing factors are found and applied in some discretionary manner by a sentencing judge, but instead, those factors are facts (like elements of an offense) that must be found by a jury beyond a reasonable doubt. Not only does the dissent misread *Sattazahn,* it would reject controlling authority by attempting to divine what may happen in a future case.

25. While these justices equate aggravators with elements of a crime, that does not mean a jury's failure to find a particular aggravating circumstance alleged by the prosecution constitutes an acquittal. Rather, aggravators are elements that, if proven, establish the greater offense of murder plus aggravating circumstances. If the jury rejects the one or more aggravators alleged and sentences the defendant to life, the defendant has been acquitted of murder plus aggravating circumstances and jeopardy attaches to that acquittal. *Sattazahn,* 537 U.S. at 112, 123 S.Ct. at 740. Such a finding is consistent with the court's prior cases. The converse is if the defendant is not acquitted of murder plus aggravating circumstances and successfully appeals, the state can seek the death penalty using any aggravator supported by the record. *Id.* at 113, 123 S.Ct. at 740.

is that it did not unanimously find that the continuing threat aggravator existed beyond a reasonable doubt. This is not the same as a unanimous finding that the aggravator does not exist at all; some jurors may have found it while others did not.[26] Jeopardy does not attach and bar retrial in that situation. *See Sattazahn*, 537 U.S. at 109, 123 S.Ct. at 738 (stating a retrial following a hung jury normally does not violate the Double Jeopardy Clause).

¶ 59 For that reason, this case does not implicate the concerns of protecting the finality of acquittals present in *Bullington* and *Rumsey*. There is no reason to shield a defendant in Hogan's position from further litigation; further litigation is the only hope he has. *Poland*, 476 U.S. at 156, 106 S.Ct. at 1756. Neither does Hogan's case present the Hobson's choice discussed by the *Sattazahn* dissent. *Sattazahn*, 537 U.S. at 126, 123 S.Ct at 748 (Ginsburg, J., dissenting)(noting that a defendant in Sattazahn's position must relinquish either his right to file a potentially meritorious appeal, or his state-granted entitlement to avoid the death penalty). When Hogan appealed and succeeded in overturning his murder conviction and vacating his death sentence, the slate was wiped clean. The State was not barred from retrying Hogan on murder plus aggravating circumstances and presenting evidence to support the continuing threat aggravator.

### C.

¶ 60 In Proposition IV, Hogan challenges the introduction of Stanley's "in-life" photograph during second stage. Hogan killed Stanley in January 1988. At the time he committed the crime, "in-life" photographs were inadmissible. *See Thornburg v. State*, 1999 OK CR 32, ¶ 23, 985 P.2d 1234, 1244. In 2002, the Legislature amended 12 O.S. § 2403, permitting the admission in a prosecution for any criminal homicide of an appropriate photograph of the victim while alive when offered by the district attorney to show the general appearance and condition of the victim while alive. Hogan claims the admission of Stanley's "in-life" photograph violated his rights under the Ex Post Facto Clause because it was not admissible at the time he killed Stanley.

¶ 61 The United States Constitution expressly prohibits states from enacting *ex post facto* laws. U.S. Const. art. I, § 10, cl. 1. "[T]he focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage' [to affected offenders] ... but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." *California Dep't of Corrections v. Morales*, 514 U.S. 499, 506 n. 3, 115 S.Ct. 1597, 1602 n. 3, 131 L.Ed.2d 588 (1995); *Barnes v. Scott*, 201 F.3d 1292, 1295 (10th Cir.2000). Permitting the admission of an "in-life" photograph in a homicide trial neither alters the definition of any crime nor increases the penalties for that crime. The Ex Post Facto Clause is not violated by the application of a new evidentiary rule in a capital trial for a crime committed before the evidentiary change. *Mitchell v. State*, 1994 OK CR 70, ¶ 51, 884 P.2d 1186, 1204, *overruled on other grounds by Mitchell v. Ward*, 150 F.Supp.2d 1194 (W.D.Okla.1999). Legislative changes in admissible testimony or evidence during the second stage of a capital trial are procedural. *Mitchell*, 1994 OK CR 70, ¶ 51, 884 P.2d at 1204. This claim therefore is denied.

¶ 62 Hogan also challenges the constitutionality of the amended § 2403, arguing the admission of an "in-life" photograph without regard to the evidentiary balancing test violates due process and makes § 2403 vague and overbroad. Hogan maintains that the blanket admissibility of such photographs unnecessarily risks exposing jurors to prejudicial information.

¶ 63 We presume that a legislative act is constitutional; the party attacking the statute has the burden of proof that it is not. *State v. Thomason*, 2001 OK CR 27, ¶ 7, 33 P.3d 930, 932. We construe statutes, whenever reasonably possible, to uphold

---

26. The *Sattazahn* court found that a lack of findings with respect to an aggravator is not an acquittal. *Sattazahn*, 537 U.S. at 109, 123 S.Ct.

at 738 ("that non-result-cannot fairly be called an acquittal 'based on findings sufficient to establish legal entitlement to the life sentence.' ")

their constitutionality. *Id.* A statute is void only when it is so vague that men of ordinary intelligence must necessarily guess at its meaning. *Id.* Section 2403 is not void for vagueness. The words of the statute are clear and self-explanatory.

¶ 64 Contrary to Hogan's claim that § 2403 permits the wholesale admission of "in-life" photographs, the statute makes it clear that only one "appropriate" photograph is admissible. 12 O.S.Supp.2003, § 2403. Inappropriate photographs would be those that violate the balancing test articulated in the preceding sentence of that section. Here, the State offered Stanley's "in-life" photograph, a graduation photograph of Stanley taken in 1986, during the second stage victim impact testimony of Stanley's mother. The photograph was offered "to show the general appearance and condition of the victim while alive." The photograph was appropriate and its probative value was not substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in admitting it.

¶ 65 Hogan also challenges the admission of twelve photographs introduced during second stage to prove that Stanley's murder was especially heinous, atrocious, or cruel. Hogan claims he was denied a fair sentencing trial because State's Exhibits 42–44, 64–70, 90–91 were extremely gruesome and unfairly prejudicial.

¶ 66 To prove a murder was especially heinous, atrocious, or cruel, the State must introduce competent evidence indicating the victim's death was preceded by torture or serious physical abuse. *See Davis v. State,* 2004 OK CR 36, ¶ 39, 103 P.3d 70, 81. To support a finding of serious physical abuse, the State must show the victim endured conscious physical suffering prior to death. *Id.* Exhibits 42, 43, and 44 were pictures of cuts on Stanley's hands showing defensive wounds. These photographs were

relevant to show that Stanley was conscious during the attack and defending herself. The relevance of these photographs was not substantially outweighed by any of the dangers set forth in 12 O.S.2001, § 2403.

¶ 67 The other nine photographs consisted of seven pictures of Stanley at the scene depicting close-up shots of Stanley's various wounds (State's Ex. 64–70) and two of Stanley at the medical examiner's office depicting the large gash wound on her neck from two different angles (State's Ex. 90–91). These photographs are gruesome. Deciding whether such exhibits are relevant and more probative than prejudicial, however, is within the trial court's discretion. *Lockett,* 2002 OK CR 30, ¶ 19, 53 P.3d at 425; 12 O.S.2001, §§ 2402–2403. The photographs were relevant and tended to prove that Stanley suffered abuse prior to her death. The evidence that Stanley's death was preceded by serious physical abuse including conscious physical suffering was strong and virtually uncontroverted. On the record before us, we cannot find the trial court abused its discretion in admitting these photographs.

### D.

¶ 68 In Proposition X, Hogan claims that he was tactically precluded from calling character witnesses in mitigation and from allowing other mitigation witnesses to testify fully because of the trial court's erroneous ruling concerning State's rebuttal witness, Kevin Freeman. The trial court barred the State from introducing certain evidence through Freeman tending to show Hogan was a continuing threat. The court's ruling was made because Freeman's evidence had not been timely disclosed to the defense. The trial court found, however, that Freeman could testify in rebuttal if the defense "opened the door." Freeman's testimony would rebut evidence of Hogan's good character.[27]

---

27. Freeman, Hogan's cousin, did testify that he and Hogan burglarized some businesses together around the time of the homicide and that Hogan had admitted shooting BB's at a closed convenience store because he was angry over being fired. The trial court did not allow Freeman to testify that Hogan had stolen a gun from his parents to shoot out the windows in the convenience store or that Hogan had indicated that if he ever encountered a witness during one of their burglaries, they would have to kill the witness so they could not be identified. The trial court also precluded Freeman from testifying that Hogan asked him and another accomplice to break into

¶ 69 While the Court ruled that the State could call Freeman in rebuttal if his testimony would be relevant to rebut Hogan's character evidence, it refused to advise the defense what specific evidence of Hogan's character would open the door to the State's rebuttal. In consequence, the defense was faced with a strategic decision. However difficult that decision might have been, the trial court committed no error here.

### E.

¶ 70 In Proposition XI, Hogan attacks the victim impact evidence in this case. First, he claims that the probative value of the victim impact evidence was substantially outweighed by the danger of unfair prejudice because it focused almost exclusively on the emotional impact of Stanley's death on her parents. Second, he argues that victim impact evidence has no place in Oklahoma's sentencing scheme because the evidence acts as a "superaggravator." Finally, he contends that its admission in this case violated the Ex Post Facto Clause.

¶ 71 This Court has consistently rejected claims that victim impact evidence acts as a superaggravator and that its admission in criminal trials where the crime was committed before the legislature passed legislation allowing it violates the Ex Post Facto Clause. See Murphy v. State, 2002 OK CR 24, ¶ 47, 47 P.3d 876, 886; Mitchell v. State, 1997 OK CR 9, ¶ 3, 934 P.2d 346, 349. Hogan cites no new authority that warrants reconsideration. These claims are denied.

¶ 72 Hogan claims the trial court erred in admitting the victim-impact evidence in this case because it was more prejudicial than probative, making it less likely that the jury's sentencing decision was a reasoned, moral response to the question of whether Hogan deserved the death penalty. Hogan claims several statements by Stanley's parents referring to her as a "special angel," and a "gift from God," and Stanley's mother's statement, "I loved and protected Ken's children and could not comprehend that he

would hurt mine" were too emotional and unfairly prejudicial to be considered by the jury in determining punishment. He also objects to Stanley's mother's testimony that she had nightmares where she would wake-up "screaming for Lisa to run."

¶ 73 Evidence about the victim and about the financial, emotional, psychological, and physical impact of the murder on the victim's family is admissible. 21 O.S.2001, § 701.10(C); 22 O.S.2001, § 984. Hogan argues his case is like Cargle v. State, 1995 OK CR 77, 909 P.2d 806, in which this Court found error in the admission of certain victim impact evidence. The Cargle court held that capital sentencing must be reliable, accurate and nonarbitrary and, consequently, inflammatory, irrelevant victim impact evidence that fails to show the financial, psychological or physical impact of the victim's death on her family, should be excluded. Cargle, 1995 OK CR 77, ¶¶ 81–82, 909 P.2d at 830. Trial courts must carefully balance the probative value of particular victim impact evidence against the danger of unfair prejudice to the defendant, and be vigilant to limit such evidence that does not fall within the statute permitting its admission. The prepared statements read by Stanley's parents were not like the victim impact evidence condemned in Cargle; rather the statements contained evidence of the emotional, psychological and physical effects of Stanley's death on her parents. The statements were concise and the emotional references to Stanley or her death did not render the statements unfairly prejudicial or inadmissible. We find the trial court did not abuse its discretion in allowing this victim impact evidence.

### F.

¶ 74 In Proposition IX, Hogan argues that the application of the especially heinous, atrocious, or cruel aggravating circumstance to situations where the evidence shows the decedent's death occurred during an altercation initiated by the decedent renders it unconstitutionally vague and overbroad unless a

---

pawn shops to steal guns to use in their burglaries and that they declined because they were

afraid Hogan would use a gun during a burglary.

finding is required that the defendant intentionally inflicted gratuitous harm beyond that caused by the rage born of the altercation. We have repeatedly upheld the constitutionality of this aggravating circumstance and decline to revisit this issue here. *Duty v. State*, 2004 OK CR 20, ¶ 13, 89 P.3d 1158, 1161; *Lockett*, 2002 OK CR 30, ¶ 40, 53 P.3d at 430. This claim is denied.

¶ 75 Hogan also asserts that the evidence in this case was insufficient to prove that aggravator beyond a reasonable doubt. When the sufficiency of the evidence supporting an aggravator is challenged on appeal, we review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the facts necessary to support the aggravating circumstance beyond a reasonable doubt. *DeRosa*, 2004 OK CR 19, ¶ 85, 89 P.3d at 1153.

¶ 76 This Court upholds a jury's finding of this aggravating circumstance when it is supported by proof of conscious, serious physical abuse or torture prior to death. *Davis*, 2004 OK CR 36, ¶ 39, 103 P.3d at 81. The evidence here showed that Hogan stabbed Stanley numerous times. That she remained in an upright position during the stabbing tended to show she was conscious. The blood pool evidence indicated that the fatal, arterial stab wounds did not occur until the end of the stabbing. Stanley had defensive wounds on her hands from her attempt to fend off the attack, providing further evidence that she had remained conscious. This evidence supports a finding beyond a reasonable doubt that Stanley was conscious and aware of what was happening to her and that she suffered serious physical abuse prior to her death.

¶ 77 Finally, Hogan argues that his death sentence is not valid because the mitigating evidence outweighed the sole aggravating circumstance. Hogan claims that the jury should have been instructed, as he requested, that the aggravating circumstances must outweigh the mitigating evidence beyond a reasonable doubt. The failure to so instruct, he contends, resulted in the imposition of a death sentence that does not meet the Eighth Amendment's reliability requirements. We rejected this claim in *Torres v. State* 2002 OK CR 35, ¶¶ 5–6, 58 P.3d 214, 216, and held that a finding that the aggravating circumstances outweigh mitigating evidence beyond a reasonable doubt is not required by *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). *Torres* is dispositive. This claim is denied.

## G.

¶ 78 In Proposition XII, Hogan claims that Oklahoma's death penalty statute violates the Establishment Clause of the First Amendment and is therefore unconstitutional.[28] Hogan contends that the effective function of execution as a punishment is dependent upon the sectarian religious notion of a meritbased afterlife, such as heaven and hell. Because a neutral post-execution existence would not cause the offender to experience the secular purposes of punishment such as the loss of property, right or privilege, Hogan argues the death penalty serves no secular function unless the offender post-execution continues to exist under circumstances contemplated by those religions that adhere to the doctrine of a punitive afterlife. By this reasoning, he argues, the death penalty unconstitutionally advances religion.

¶ 79 Whether Oklahoma's death penalty statute violates the Establishment Clause is a question of first impression for this Court. A statute does not violate the Establishment Clause if (1) it has a secular legislative purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not create excessive entanglement between government and religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971); *Tulsa Area Hosp. Council v. Oral Roberts Univ.*, 1981 OK 29, ¶ 14, 626 P.2d 316, 321.

---

**28.** The Establishment Clause of the First Amendment of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion." This guarantee was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

¶ 80 The Texas Court of Criminal Appeals rejected the claim that Texas's death penalty statute violated the Establishment Clause and advanced religion in *Holberg v. State*, 38 S.W.3d 137 (Tex.Crim.App.2000). The *Holberg* court stated, "[t]he primary effect of the [death penalty] statutes is penal in nature, not religious, and the mere fact that the statutes are consistent with the tenets of a particular faith does not render the statutes in violation of the Establishment Clause." *Holberg*, 38 S.W.3d at 140. The *Holberg* court cited the following secular beliefs it viewed as supporting the legislature's decision to enact Texas's death penalty statutes:

(1) the death penalty is the only proportional punishment for certain crimes;

(2) the death penalty ensures, at a minimum, that the offender will never harm anyone again;

(3) the death penalty may deter some persons (professional criminals and those already imprisoned for life), and possibly others, from committing murder; and

(4) life imprisonment without parole is not a viable alternative to the death penalty because,

(a) capital offenders are a danger to others in the prison environment,

(b) persons imprisoned literally for life have little incentive to behave properly, and

(c) it is undesirable, costly, and possibly inhumane to keep persons in prison until they actually die from old age or disease.

*Holberg*, 38 S.W.3d at 140, *see also Gregg v. Georgia*, 428 U.S. 153, 183–86, 96 S.Ct. 2909, 2930–31, 49 L.Ed.2d 859 (1976)(plurality—social purposes are retribution and deterrence).

¶ 81 We find the reasoning in *Holberg* persuasive and that the purpose of the death penalty statute in Oklahoma is likewise punitive in nature. The purpose and primary effect of our death penalty statute is not the advancement of any religion; it does not violate the Establishment Clause.

¶ 82 Next Hogan contends that the justifications for the death penalty are invalid. He argues that the death penalty is neither cost-effective nor serves as a deterrent to would-be offenders. To support this claim Hogan requests an evidentiary hearing to supplement the record with evidence concerning this issue and funding for the presentation of expert testimony on this issue. Not even a clear showing that the death penalty was not cost-effective and wholly failed to deter criminal acts would justify this Court in abolishing the death penalty. The issues Hogan raises here are policy matters clearly within the purview of the legislature and not the courts. Hogan's request for an evidentiary hearing is denied.

¶ 83 Hogan also argues that Oklahoma's death penalty procedure in 21 O.S. 2001, § 701.11 violates the Oklahoma Constitution. Specifically Hogan complains that the jury procedure violates the provisions against special verdicts in art. 7, § 15. We rejected this argument in *Romano*, 1995 OK CR 74, ¶ 105, 909 P.2d at 125; that case is dispositive here. This claim is denied.

## H.

¶ 84 In Proposition XIII, Hogan raises six issues previously settled by this Court in order to prevent a finding of waiver in any subsequent state or federal proceedings. Hogan concedes that we have previously rejected each contention. *See Harris v. State*, 2004 OK CR 1, ¶ 52, 84 P.3d 731, 751(Oklahoma's capital sentencing scheme is constitutional; capital defendant has neither right to allocution before jury nor right to argue last; defendant has no right to separate jury for capital sentencing); *Williams v. State*, 2001 OK CR 24, ¶ 6, 31 P.3d 1046, 1049 (instruction defining life without parole in a capital case unwarranted); *Al–Mosawi v. State*, 1996 OK CR 59, ¶ 78, 929 P.2d 270, 287 (it is not error to exclude evidence on the cost-effectiveness of the death penalty);[29] *Bernay v. State*, 1999 OK CR 37, ¶¶ 49–50, 989 P.2d 998, 1012 (no constitutional right to a jury instruction making residual doubt a mit-

---

**29.** We denied Hogan's request for an evidentiary hearing and funds for an expert on the cost effectiveness and deterrent value of the death penalty in Proposition XII, *supra*.

igating circumstance). We are not persuaded to reconsider any of these issues. The claims raised in Proposition XIII are denied.

## I.

¶ 85 In Proposition XIV, Hogan claims the trial court erred in failing to instruct the jury in second stage that it was to determine the voluntariness of his statements to police and disregard them if it found the statements were not voluntary. Because Hogan failed to object and request such an instruction, we review for plain error only. *See Norton*, 2002 OK CR 10, ¶ 17, 43 P.3d at 409; 20 O.S.2001, § 3001.1.

¶ 86 The record shows, and Hogan concedes, that the trial court gave the proper instruction concerning the voluntariness of his statements to police in its first stage instructions. The record further shows that the trial court instructed the jury that its first stage instructions were applicable during second stage where appropriate. The instruction Hogan complains was omitted was in fact incorporated into the trial court's second stage instructions. This claim is without merit.

## VI. PROSECUTORIAL MISCONDUCT

¶ 87 In Proposition XV, Hogan argues that certain parts of the prosecutor's closing arguments constitute prosecutorial misconduct and violated his right to due process and a fair trial. Hogan objected to only one of the comments, preserving the error for appeal; we review the remaining remarks identified on appeal for plain error only. *Matthews v. State*, 2002 OK CR 16, ¶ 38, 45 P.3d 907, 920.

¶ 88 In reviewing this due process claim, we must determine whether the prosecutorial misconduct so infected Hogan's trial that it was rendered fundamentally unfair, such that the jury's verdict should not be relied upon. *DeRosa*, 2004 OK CR 19, ¶ 53, 89 P.3d at 1145. We evaluate the alleged misconduct within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel. *Id.*

¶ 89 First, Hogan argues that the prosecutor "conditioned jurors to equate their responsibility of ensuring justice with imposing the death penalty" throughout trial. He claims this type of argument fosters an "us against them" attitude and argues it is improper for a prosecutor to tell a jury that the only justice is the prosecutor's view of justice. He cites portions of two segments of the prosecutor's closing argument which read in full:

What is justice? Because that's the ultimate issue. What verdict can you walk back into this courtroom and bring to us and say out loud that will represent to the parties involved in this lawsuit justice? Because that's the issue that you now have before you. Justice. That we talked about all through voir dire. We talked about it—and I know I discussed it with each and every one of you individually, the issue of justice, and the fact that you take an oath to bring justice to this courtroom. That's what you promised me that you would do.

And I would submit to you that based on the law that you have and the facts that you've heard that there is no verdict that represents justice for this (indicating), no verdict that you could bring into this courtroom that represents justice other than the penalty of death. And I ask that you go upstairs and that you do your duty as jurors and that you return to this courtroom with a verdict of death for Mr. Hogan.

¶ 90 There was no objection in either instance. This Court condemns arguments that improperly express a prosecutor's personal opinion as to the appropriateness of the death penalty. *See Washington v. State*, 1999 OK CR 22, ¶ 63, 989 P.2d 960, 979; *Ochoa v. State*, 1998 OK CR 41, ¶ 55, 963 P.2d 583, 601. This Court, however, has found such comments do not rise to the level of plain error where the prosecutor's remarks were "not phrased in personal terms, but appealed to the jury's understanding of justice and asked that standard be upheld." *Mitchell v. State*, 1994 OK CR 70, ¶ 44, 884

P.2d 1186, 1202. When the remarks are taken in context, it is clear that the prosecutor was arguing that justice required the death penalty be imposed under the particular facts and law of Hogan's case and was not stating her personal opinion. Hogan has failed to show these remarks rise to the level of plain error. *See Lockett,* 2002 OK CR 30, ¶ 21, 53 P.3d at 425.

¶ 91 Next Hogan claims that the prosecutor denigrated his defense by arguing that his statements about Stanley's death were self-serving and by telling the jury that Hogan "butchered" her. Again, there were no objections to these statements. These comments did not deprive Hogan of a fair trial or sentencing. "Parties have wide latitude, in closing argument, to discuss the evidence and reasonable inferences from evidence, and relief is required only where grossly improper and unwarranted argument affects a defendant's rights." *Hanson v. State,* 2003 OK CR 12, ¶ 13, 72 P.3d 40, 49. The prosecutor's remarks were reasonable inferences based on the evidence. Hogan again fails to prove plain error.

¶ 92 Third, Hogan claims that the prosecutor erroneously told the jury not to consider his mitigating evidence when the prosecutor stated, "I would submit to you that certainly with respect to mitigator number six, that there is no proof at all that Mr. Hogan feels one ounce of remorse for what he did to Lisa Renee Stanley." There was no objection to this statement. The comment was a reasonable inference based on the evidence and thus Hogan cannot prove plain error. *Id.*

¶ 93 Fourth, Hogan claims the prosecutor violated his right to a fair and reliable sentencing proceeding by equating guilt with the reduction of moral culpability in its second stage closing argument. Because the purpose of mitigating evidence is to reduce moral culpability at sentencing, not legal responsibility for the offense, *see* OUJI–CR 2d No. 4–78, he contends the prosecutor's argument confused the jury and effectively told it

to disregard his mitigating evidence entirely. Hogan cites the prosecutor's argument questioning whether his mitigating evidence actually mitigated against the death penalty.[30] Hogan objected to this line of argument. The trial court overruled Hogan's objection, but told the prosecutor to "read the instruction" defining mitigating evidence.

¶ 94 "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." OUJI–CR2d 4–78. The fact finder determines what circumstances are mitigating under the facts and circumstances of any case. In *Harris,* we rejected the defendant's claim that the prosecutor mischaracterized his mitigating evidence by rhetorically asking the jury whether it rendered the defendant "less responsible" for his crimes. *Harris,* 2004 OK CR 1, ¶ 59, 84 P.3d at 752–53. The prosecutor in Hogan's case made this same type of argument. As in *Harris,* the prosecutor's argument, when considered in its entirety, took issue with each piece of Hogan's mitigating evidence, but did not tell the jury to ignore it. The jury was properly instructed on mitigating circumstances. We find no error here.

¶ 95 Fifth, Hogan claims that the prosecutor argued that all murders deserve the death penalty. Hogan did not object. When the prosecutor's argument is read in context, the prosecutor told the jury its punishment decision should fit the crime that Hogan committed. This argument was not improper and Hogan cannot show plain error.

¶ 96 Hogan also argues that the cumulative effect of these arguments contributed to his conviction and death sentence. We have found no individual error; therefore we do not find any relief is warranted when the remarks are considered in the aggregate.

¶ 97 Hogan argues, finally, that to the extent any of these claims are deemed

---

30. Hogan quotes a part of one sentence from the five pages that he references for this complaint. The sentence in full reads, "I would submit to you based on the evidence that you're going to

find that the State of Oklahoma has in fact proved the aggravators and that in fact the mitigators don't exist or certainly could not in any way reduce his culpability for this offense."

forfeited by counsel's failure to object, he was denied his Sixth Amendment right to the effective assistance of counsel. Having found no error, Hogan cannot prevail on this claim under the *Strickland* test; he cannot show prejudice. *Lockett*, 2002 OK CR 30, ¶ 15, 53 P.3d at 424. This claim is denied.

## VII. CUMULATIVE ERROR

 ¶ 98 In Proposition XVI, Hogan claims that even if no individual error in his case merits reversal, the cumulative effect of the errors committed during his trial necessitates reversal of his conviction or modification of his death sentence. This Court has recognized that when there are "numerous irregularities during the course of [a] trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors was to deny the defendant a fair trial." *DeRosa*, 2004 OK CR 19, ¶ 100, 89 P.3d at 1157 (*quoting Lewis v. State*, 1998 OK CR 24, ¶ 63, 970 P.2d 1158, 1176). We have reviewed Hogan's claims for relief and the record in this case and conclude that, although his trial was not error free, any errors and irregularities, even when considered in the aggregate, do not require relief because they did not render his trial fundamentally unfair, taint the jury's verdict, or render sentencing unreliable. Any errors were harmless beyond a reasonable doubt, individually and cumulatively.

## VIII. MANDATORY SENTENCE REVIEW

¶ 99 In Proposition XVII, Hogan contends that his death sentence cannot be upheld under this Court's mandatory sentence review. Title 21 O.S.2001, § 701.13 requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance."

1. I must also note that I concur in the resolution of Proposition II only by reason of *stare decisis*.

2. Hogan did not object to the jury instructions given during his retrial, nor did he offer an instruction of the sort he now asserts should

After conducting this review, this Court may order any corrective relief that is warranted or affirm the sentence. 21 O.S.2001, § 701.13(E).

¶ 100 We have reviewed the record in this case in conjunction with Hogan's claims for relief and have found that Hogan's conviction and death sentence were not the result of trial court error, prosecutorial misconduct, or improper evidence or witness testimony. We therefore find Hogan's death sentence was not imposed because of any arbitrary factor, passion, or prejudice.

¶ 101 We have also upheld the jury's finding that the murder was especially heinous, atrocious, or cruel because the aggravating circumstance is factually substantiated. The Judgment and Sentence of the trial court is **AFFIRMED.**

C. JOHNSON, and LEWIS, JJ.: concur.

LUMPKIN, V.P.J.: concur in results.

CHAPEL, P.J.: dissent.

CHAPEL, Judge, Dissenting:

¶ 1 I dissent from today's opinion because I disagree with the majority's resolution of Propositions I, V, VI, and VIII of Hogan's appeal.[1]

¶ 2 Hogan admitted that he killed Lisa Stanley. His defense to the first-degree murder charge against him was that he killed her in a "heat of passion," which constituted first-degree manslaughter rather than malice-aforethought murder. In Proposition I, Hogan claims that his jury should have been instructed on his theory of defense, *i.e.*, that the killing was heat-of-passion manslaughter, and that the State was required to prove, beyond a reasonable doubt, that he did *not* kill in the heat of passion.[2] Today's majority opinion accepts all the basic components of Hogan's argument, but declines to reach the conclusion they portend.

have been given by the trial court. Hence he argues that the failure of the trial court, *sua sponte*, to instruct the jury on his theory of defense and the State's burden to disprove it was plain error.

938

¶ 3 The majority opinion accepts the following components of Hogan's argument. First, "trial courts have a duty to instruct the jury on the salient features of the law raised by the evidence with or without a request."[3] Second, Hogan "defended the first degree murder charge by attempting to convince the jury that he did not kill Stanley with a deliberate intent but rather acted in a heat of passion."[4] Third, "[o]nce a defense is raised[,] the defendant is entitled to an instruction on his theory of defense."[5] Fourth, "[t]he burden of persuasion remains on the State to prove each element of the crime charged beyond a reasonable doubt and thus to prove beyond a reasonable doubt the absence of any affirmative defense raised."[6]

¶ 4 Thus the logical legal conclusion to draw from the Court's analysis appears to be that once sufficient evidence has been presented at trial to raise the affirmative defense (to a first-degree murder charge) of heat-of-passion manslaughter, the trial court should be required, with or without a request from the defendant, to instruct the jury that heat-of-passion manslaughter is the defendant's defense *and* to instruct the jury that in order to convict the defendant of first-

degree murder, the State is required to establish, beyond a reasonable doubt, that the defendant was *not* acting in the heat of passion. This conclusion is also the logical extension of the precedents of this Court.

¶ 5 In *Mullaney v. Wilbur*,[7] a unanimous Supreme Court held that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case."[8] In *United States v. Lofton*,[9] the Tenth Circuit Court of Appeals concluded that "*Mullaney* requires us to hold that a defendant in a federal murder case who has sufficiently raised a heat of passion defense is entitled to instructions informing the jury of the theory of defense and of the Government's duty to prove beyond a reasonable doubt the absence of heat of passion in order to obtain a murder conviction."[10]

¶ 6 In *Davis v. Maynard*,[11] the Tenth Circuit Court of Appeals considered an Oklahoma defendant's habeas corpus challenge to the jury instructions in his first-degree murder trial. The *Davis* court began by emphasizing the limited context of habeas review.[12]

3. *See* Majority Opinion, p. 923 (citations omitted).

4. *Id.*

5. *Id.* at p. 924 (internal citations omitted).

6. *Id.* at p. 924 (citation omitted). In support of this statement, the majority opinion cites our uniform jury instructions for other affirmative defenses, which are structured such that once sufficient evidence has been presented (by either party) to raise a particular affirmative defense, the trial court is required to instruct the jury on that defense *and* to instruct that the State is required to prove, beyond a reasonable doubt, the absence of that defense. *See id.* at p. 923 n. 10.

7. 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

8. *Id.* at 704, 95 S.Ct. at 1892. The *Mullaney* case involved a Maine jury instruction that informed the jury that if the State proved that a homicide was both intentional and unlawful, malice aforethought had been established, unless the defendant could prove, by a preponderance of the evidence, that he acted in the heat of passion on sudden provocation. *Id.* at 686, 95 S.Ct. at 1883. The *Mullaney* Court noted that "the presence or

absence of the heat of passion on sudden provocation[ ] has been, almost from the inception of the common law of homicide, the single most important factor in determining the degree of culpability attaching to an unlawful homicide." *Id.* at 696, 95 S.Ct. at 1888.

9. 776 F.2d 918 (10th Cir.1985).

10. *Id.* at 920. The *Lofton* court noted that the defendant failed to object to the jury instructions in that case, "despite ample opportunity," but concluded, nevertheless, that the federal district court committed "plain error" by failing to instruct the jury regarding her heat-of-passion defense and the Government's duty to disprove it. *Id.* at 922.

11. 869 F.2d 1401 (10th Cir.1989), *cert. granted and judgment vacated on another ground by Saffle v. Davis*, 494 U.S. 1050, 110 S.Ct. 1516, 108 L.Ed.2d 756 (1990), *on remand, Davis v. Maynard*, 911 F.2d 415 (10th Cir.1990).

12. The court noted that in this kind of collateral attack on a state court judgment, the question is whether the challenged instruction " 'so infected the entire trial that the resulting conviction violates due process,' not merely whether 'the in-

The court also emphasized that Davis, unlike the defendants in *Mullaney* and *Lofton*, did not present a heat-of-passion defense, since his "sole defense at trial was self-defense." [13] Finally, after examining the specific jury instructions at issue, the *Davis* court concluded that these instructions, "unlike those in *Lofton*, explicitly defined malice and heat of passion as *mutually exclusive*." [14] Thus the finding by Davis's jury that he killed with malice aforethought "necessarily implies the absence of heat of passion." [15]

¶ 7 In *McCormick v. State*,[16] our Court addressed the "unique situation" where the offense of heat-of-passion manslaughter "functioned not as simply an alternative to the charge of murder, but as an affirmative defense to the crime charged by the State." [17] Although McCormick's jury was instructed on the elements of heat-of-passion man-

slaughter, the trial court refused to give an additional instruction specifically informing the jury that it could only convict McCormick of first-degree murder if the State proved, beyond a reasonable doubt, that he was *not* acting in the heat of passion.[18] While this Court acknowledged the appropriateness of such an instruction, we ruled that the trial court's failure to so instruct was not reversible error.[19] We found that McCormick's case was more like *Davis* than *Lofton*, because it involved jury instructions that were "mutually exclusive." [20] "[T]he language used by the trial court was unequivocal; a murder conviction required proof of a deliberate intent to kill[,] while manslaughter should be found if the killing was done without a design to effect death." [21] Thus the instructions defined the two mental states and the two crimes such that they did not overlap and could not co-exist.[22]

struction is undesirable, erroneous, or even "universally condemned." ' " *Id.* at 1405 (all citations omitted).

13. *Id.* at 1404. The *Davis* court questioned whether the trial court's decision to instruct on heat-of-passion manslaughter was even warranted, under the facts of that case. *See id.* at 1406.

14. *Id.* at 1406 (emphasis added). The instructions in *Davis* defined first-degree manslaughter as a homicide "perpetrated without a design to effect death." The jury was instructed that in order to convict the defendant of heat-of-passion manslaughter, the passion "must have existed to such a degree as would naturally destroy the sway of reason and render the mind incapable of cool reflection, and thus exclude malice aforethought." In addition, the jury was specifically instructed that "[m]alice and heat of passion cannot co-exist." *Id.* at 1405.

15. *Id.* at 1406–07. Thus the *Davis* court concluded that where heat of passion is not "squarely raised" as a defense and where the jury's instructions define "malice" and "heat of passion" such that they cannot co-exist, "the jury need not be instructed specifically that the prosecution must prove the absence of heat of passion...." *Id.* at 1407.

16. 1993 OK CR 6, 845 P.2d 896.

17. *Id.* at ¶ 18, 845 P.2d at 899. While McCormick admitted killing the victim, he maintained that he "lacked the malice aforethought necessary to sustain a conviction for murder because

he was acting under the 'heat of passion' at the time." *Id.* at ¶ 18, 845 P.2d at 899–900.

18. *Id.* at ¶ 16, 845 P.2d at 899. McCormick proffered the following specific instruction at his trial:

[Y]ou are instructed that the State has the burden of proving beyond a reasonable doubt that the Defendant did not act in the heat of passion before you could convict him of First Degree Murder. If the State failed to prove beyond a reasonable doubt that the Defendant did not act in the heat of passion, then you cannot convict the Defendant of First Degree Murder, but must consider whether the Defendant is guilty of the lesser included offense of First Degree Manslaughter.

*Id.*

19. *Id.* at ¶ 28, 845 P.2d at 901 (finding that quoted instruction "would not have been inappropriate in this instance").

20. *Id.* at ¶ 26, 845 P.2d at 901.

21. *Id.* at ¶ 26, 845 P.2d at 901. The *McCormick* jury, like the *Davis* jury, was instructed that in order to convict the defendant of manslaughter, the jury had to find that the killing was "perpetrated without a design to effect death," while a first-degree murder conviction required a finding that the defendant acted with "a deliberate intention to take away the life of a human being." *Id.* at ¶¶ 23–24, 845 P.2d at 900.

22. It should be noted, however, that the *McCormick* instructions were much less explicit than

¶ 8 This brings us to *Black v. State*,[23] in which this Court addressed jury instructions just like the ones used at Hogan's trial and a challenge just like the one being made in Hogan's appeal.[24] I do not dispute the majority's assertion that under the analysis of *Black*, Hogan's Proposition I claim fails. I maintain, however, that the analysis of *Black* on this issue was and is flawed and inconsistent with our caselaw. Furthermore, the faulty analysis of *Black* has needlessly delayed the salutary adoption of a uniform jury instruction addressing the proper approach to a defendant's assertion of heat-of-passion manslaughter as an affirmative defense to first-degree murder.[25]

¶ 9 The first-degree murder defendant in *Black*—like the defendants in *Mullaney, Lof-*

*ton*, and *McCormick*, and like Hogan—invoked heat-of-passion manslaughter "not simply as an alternative to the charge of murder, but as an affirmative defense to the crime charged by the State."[26] Although *Black*'s jury was instructed regarding the elements of first-degree murder and the lesser offense of heat-of-passion manslaughter, according to all of the current uniform instructions for these offenses, his jury was not advised that heat-of-passion manslaughter was his defense, nor was his jury informed that the State had to disprove this defense, in order for him to be convicted of first-degree murder.[27] Black challenged the trial court's failure to instruct on these two issues, just as Hogan does in the current appeal.[28]

the *Davis* instructions, which actually stated that "[m]alice and heat of passion cannot co-exist."

23. 2001 OK CR 5, 21 P.3d 1047.

24. Not surprisingly, Hogan struggles to distinguish his case from *Black*, since the defendant in that appeal did not prevail. Hence Hogan emphasizes that the trial court did not use all of the appropriate uniform instructions in instructing his jury. Hogan is correct that the trial court should have used OUJI–CR2d 10–24 to instruct his jury regarding its consideration of first-degree murder in relation to the lesser offense of first-degree manslaughter. Instead, the court's Instruction No. 13 combined various portions of uniform instructions 10–13, 10–24, and 4–66. And in Instruction No. 14, the court modified the former OUJI–CR2d 10–27, to specifically inform the jury that it was "not required to determine unanimously that the defendant [is] not guilty of the crime charged before you may consider a lesser included offense," consistent with this Court's decision in *Graham v. State*, 2001 OK CR 18, 27 P.3d 1026. (In 2003, OUJI–CR2d 10–27, as modified in accord with *Graham*, was incorporated into the current version of OUJI–CR2d 10–24.)

On the other hand, the trial court *did* use the appropriate uniform instructions for defining first-degree murder and heat-of-passion manslaughter, as well as the all the key elements and terms within these offenses, namely, OUJI–CR2d 4–61, 4–62, 4–63, 4–95, 4–97, 4–98, 4–99, 4–100, and 4–101. Although Hogan argues that the order in which the instructions were presented was confusing, he cannot point to any specific issue upon which the instructions were incomplete or inconsistent with the law in effect at the time. In fact, Hogan acknowledges that the issue about which he is actually appealing, *i.e.*, the failure to instruct his jury regarding its consideration of heat-of-passion manslaughter as an affirmative defense to first-degree murder, was not

then and is not now contained in any uniform instruction.

While I agree that it is almost always the better and more prudent approach to instruct according to our uniform instructions, I conclude that the trial court's instructions were not inconsistent with Oklahoma law in effect at the time, nor did they prejudice Hogan in this regard. The court's modification of the uniform instructions had no impact upon Hogan's actual challenge within Proposition I. Hence the majority's notation that the now-challenged instructions were "based largely on instructions [Hogan] proposed" and its subsequent invocation of the "invited error" doctrine both turn out to be entirely irrelevant. *See* Majority Opinion, pp. 923, 925. Properly understood, Hogan's Proposition I claim is indeed an exact parallel of the claim made in *Black*. We should use this opportunity to reconsider *Black* and resolve this important issue correctly.

25. Although I did not join the Court's opinion in *Black*, I acknowledge that I did concur in result.

26. *Black*, 2001 OK CR 5, ¶ 42, 21 P.3d at 1065.

27. *See id.* at ¶ 47, 21 P.3d at 1066 ("Nowhere in the instructions was the jury advised that heat of passion manslaughter was Appellant's defense or that the State had the burden to disprove heat of passion beyond a reasonable doubt."). Thus the instructions given in Black's trial paralleled those given in Hogan's retrial; and since Black failed to object to the instructions regarding heat-of-passion manslaughter, we reviewed his claims only for plain error. *Id.* at ¶ 41, 21 P.3d at 1065.

28. Black also asserted that his jury should have been instructed that manslaughter should be considered "in tandem" with the murder charge. *Id.* at ¶ 41, 21 P.3d at 1064.

¶ 10 We acknowledged in *Black* that "this Court has been inconsistent in its rulings on whether a defendant can commit heat of passion manslaughter if the defendant intended to kill."[29] We concluded, however, that we did not need to resolve this inconsistency in *Black*, because the instructions used in Black's case did not contain any language defining manslaughter as a homicide "perpetrated without a design to effect death."[30] Instead, Black's jury was instructed that a conviction for heat-of-passion manslaughter required the State to prove: 1) the death of a human; 2) caused by the defendant; 3) the death was not excusable or justifiable; 4) the death was inflicted by means of a dangerous weapon; and 5) when performing the conduct which caused the death, defendant was in a heat of passion.[31] Hence Black's jury was not required to make such a finding, and any inconsistency regarding this element could not have prejudiced Black.[32]

¶ 11 Remarkably, after emphasizing that Black's jury was *not* instructed that heat-of-passion manslaughter required a lack of intent to kill, the *Black* opinion goes on to conclude that under *Davis* and *McCormick*—

which specifically relied upon the inclusion of this very instruction—the jury instructions given to Black's jury were not erroneous.[33] The *Black* opinion noted that Black's jury was instructed according to the uniform instructions relating to heat-of-passion manslaughter.[34] Hence Black's jury and Hogan's jury were both instructed according to the following uniform instruction:

> The passion or emotion which must exist in the defendant refers to any strong emotion, such as fear, terror, anger, rage or resentment. This passion or emotion must have existed to such a degree as would naturally *affect* the ability to reason and render the mind incapable of cool reflection. *However, the passion need not have been such as would entirely overcome reason, or be so overpowering as to destroy free exercise of choice.* ...[35]

Nevertheless, the *Black* opinion concluded that, under these instructions, acting in the "heat of passion" and acting with "deliberate intent" are "mutually exclusive" and that these mental states "cannot co-exist."[36]

29. *Id.* at ¶ 39, 21 P.3d at 1064 (citing cases with contrary holdings on this issue).

30. *Id.* at ¶ 40, 21 P.3d at 1064. This language comes directly from the first-degree manslaughter statute. *See* 21 O.S.2001, § 711(2) (defining heat-of-passion manslaughter as a homicide "perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon ..."). Nevertheless, our current uniform instruction defining the elements of manslaughter, unlike the instructions in *Davis* and *McCormick*, does not contain any language about lack of a design to kill. *See* OUJI–CR2d 4–95 (2000 Supp.).

31. *See* 2001 OK CR 5, ¶ 40, 21 P.3d at 1064 (citing former OUJI–CR2d 4–96). This instruction, with the same five elements, has since been incorporated into OUJI–CR2d 4–95. *See* OUJI–CR2d 4–95 (Supp.2000). Hogan's jury was instructed according to this uniform instruction, with these same five elements. Although none of the cases discussed herein involves a first-degree manslaughter that was perpetrated "in a cruel and unusual manner," rather than "by means of a dangerous weapon," this crime is also covered by the current version of OUJI–CR2d 4–95 (which contains alternative language for such cases) and by the analysis I propose herein.

32. *See* 2001 OK CR 5, ¶ 40, 21 P.3d at 1064.

33. *See id.* at ¶ 47, 20 P.3d at 1066–67.

34. *Id.* at ¶ 47, 20 P.3d at 1066.

35. *See* OUJI–CR2d 4–99 (all emphasis added). It should be noted that this language is exactly the same as the language used in the original version of this State's uniform criminal jury instructions, in 1981. *See* OUJI–CR2d 458 (Manslaughter in the First Degree—Passion Defined).

36. As quoted *supra* by today's majority opinion, the *Black* opinion asserted as follows:

> Because heat of passion requires the defendant to act on the force of a strong emotion following adequate provocation that would naturally affect the ability to reason and render the mind incapable of cool reflection, *i.e.*, not with a deliberate intent pre-formed, the Oklahoma definitions of malice and heat of passion show they cannot co-exist. Although the instructions in the instant case do not specifically state these mental states cannot co-exist as in *Davis*, the definitions employed to define the mental states of murder and heat of passion manslaughter sufficiently informed the jury that the differing mens rea elements were mutually exclusive.
> *Id.* at ¶ 47, 21 P.3d at 1066–67.

¶ 12 This analysis, upon which today's majority opinion rests its rejection of Hogan's Proposition I claim, is indefensible. While it was plausible to conclude that the instructions used in *McCormick*—where heat-of-passion manslaughter was defined as a homicide "perpetrated without a design to effect death"—made the mental states for heat-of-passion manslaughter and first-degree murder "mutually exclusive," such a conclusion cannot be sustained when this *lack* of a "design to effect death" has been . eliminated from the instruction defining the elements of heat-of-passion manslaughter, particularly when the above-quoted definition of "passion" is given.

¶ 13 Our uniform instruction defining what kind of "passion" must exist for heat-of-passion manslaughter makes quite clear that

acting in the "heat of passion" and acting with "deliberate intent" are *not* mutually exclusive.[37] Although the heat of passion can "affect" a person's ability to reason, it does not necessarily "overcome reason" or "destroy free exercise of choice." Hence a jury can properly convict a defendant of heat-of-passion manslaughter, even though the jury believes that the defendant had a deliberate intent to kill.[38]

¶ 14 This conclusion fits with our common-sense understanding that even when people are affected by very strong emotions, this does not necessarily mean that they lose complete control of their ability to control their actions, nor does it mean that they cannot act deliberately, such that they can and should be held accountable for their ac-

---

**37.** *See* OUJI–CR2d 4–99 (quoted *supra* in text).

**38.** In footnote 13, today's majority opinion acknowledges that "[a]cting in the heat of passion need not overcome the killer's reason or destroy free exercise of choice." Hence today's majority opinion appears to agree that a defendant can properly be convicted of heat-of-passion manslaughter even though he had a deliberate intent to kill his victim. Thus the majority opinion appears also to agree that, despite the language of Oklahoma's manslaughter statute, lack of a "design to effect death" is *not* an element of heat-of-passion manslaughter under current Oklahoma law. This agreement would seem to end our debate, since it was the presence of this very element in heat-of-passion manslaughter that justified the conclusions in *Davis* and *McCormick* that the mental states for heat-of-passion manslaughter and first-degree murder were "mutually exclusive."

In footnote 13, however, today's majority attempts to find a new way to distinguish the mental states required for these two crimes, by discovering a new element in malice-aforethought murder: a "requirement of deliberation." In essence, footnote 13 attempts to extend the first-degree murder requirement of "deliberate intent" into an additional requirement that the defendant engage in an act of "deliberation" about whether to kill or not. In addition to referring to a "requirement of deliberation," footnote 13 asserts that "[a] deliberate act is one that requires a cool mind that is capable of reflection." While some might believe that the State should be required to prove some amount of reflective "deliberation" by a "cool mind" before a person can be convicted of first-degree murder, such a requirement has no basis in the current law of this State, either statutory or decisional; and footnote 13 proffers no authority for its new approach.

As our uniform jury instructions assert, the four elements of first-degree murder in Oklahoma are: 1) the death of a human, 2) which was unlawful, 3) caused by the defendant, and 4) caused with malice aforethought. *See* OUJI–CR2d 4–61; *see also* 21 O.S.2001, § 701.7 ("A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being."). We then define "malice aforethought" as "a deliberate intention to take away the life of a human being." *See* OUJI–CR2d 4–62; *see* also 21 O.S.2001, § 701.7 ("Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof."). Our uniform instructions note that this "deliberate intent to take a human life must be formed before the [homicidal] act," although "[n]o particular length of time is required for formation of this deliberate intent." *See* OUJI–CR2d 4–62. And our uniform instructions specifically note that "[t]he intent may have been formed instantly before commission of the act." *Id.* Yet the idea that deliberate intent can be formed "instantly before the commission of the act" is inconsistent with the suggestion that cool-minded "deliberation" is required.

Oklahoma law requires that the State establish that the defendant had a "deliberate intent" to kill his or her victim. Oklahoma law does *not* require (and never has required) that the defendant go through some kind of reflective decision-making process, *i.e.*, "deliberation," before killing the victim. In fact, such a requirement would seem to go beyond even the traditional concept of "premeditation" that this State (and this Court) has consciously declined to require when it comes to defining the elements of first-degree murder. We simply require that the killing be done *deliberately*, meaning, in essence, "on purpose." Deliberation is not required.

tions.[39] In fact, this same commonsense understanding of human behavior appears to be the basis for establishing heat-of-passion manslaughter as a crime, while recognizing that it is a lesser crime than first-degree murder.[40] It is also consistent with our recognition that heat-of-passion manslaughter can serve as an affirmative defense—though not a complete defense—to first-degree murder.

¶ 15 Although the *Black* opinion concluded that the instructions in that case were "constitutionally adequate,"[41] it acknowledged that "more specific instructions," regarding the jury's consideration of heat-of-passion manslaughter as an affirmative defense to first-degree murder, could be "desirable."[42] Today's majority opinion likewise recognizes that "more specific instructions setting forth heat of passion manslaughter as a defense rather than a lesser included offense, if requested, may be better suited and desirable."[43] I maintain that such instructions are not only desirable, they are necessary under the constitutional mandate of Due Pro-

cess. Heat-of-passion manslaughter is an appropriate affirmative defense to a malice-aforethought murder charge in Oklahoma. Hence a defendant who relies upon this defense is entitled to an instruction informing his jury of it, as long as some evidence has been admitted that supports the defense.[44] Furthermore, such a defendant is also entitled to an instruction informing his jury that the State is required to disprove this defense, in order for him to be convicted of first-degree murder.

¶ 16 Most of the affirmative defenses recognized in Oklahoma (and noted by the majority opinion) are "complete defenses" or "exculpating defenses." Such defenses, when properly established, totally absolve the defendant of criminal liability. These defenses include insanity, self-defense, defense of another, accident, involuntary intoxication, and duress.[45] Although a defendant can certainly raise heat-of-passion manslaughter as an affirmative defense to a malice-aforethought murder charge, this defense is an "incomplete defense" or "partial de-

---

**39.** Hence I agree with this Court's jurisprudence that *lack* of a design to effect death is not an element of heat-of-passion manslaughter and with the decision by the drafters of our uniform instructions not to include such a lack of intent as an element of heat-of-passion manslaughter ... despite the statutory language of 21 O.S. 2001, § 711(2).

**40.** In *Morgan v. State*, 1975 OK CR 89, ¶ 4, 536 P.2d 952, 954, this Court emphasized that heat-of-passion manslaughter occupies "a midway position between self-defense and murder." The Court noted that with self-defense "the blow is excused, because necessary to save the life of the person striking it, or to prevent grievous bodily harm; while in manslaughter there is no such necessity, and the blow is only partially excused, because given in the heat of passion." *Id.* at ¶ 5, 536 P.2d at 954 (quoting Miller, Criminal Law, § 92). As we recently noted in *McHam v. State*, 2005 OK CR 28, ¶ 14 n. 3, 126 P.3d 662, 668 n. 3, *Morgan* was subsequently overruled in *Walton v. State*, 1987 OK CR 227, ¶¶ 7–9 744 P.2d 977, 978–79. As *McHam* recognized, however, *Walton* overruled *Morgan* "only insofar as [*Morgan*] had been interpreted to hold that in every prosecution for first-degree, premeditated murder, if self-defense has been raised, the trial court's failure to instruct on heat-of-passion manslaughter is per se reversible error." *McHam*, 2005 OK CR 28, ¶ 14 n. 3, 126 P.3d at 668 n. 3 (all emphasis in *McHam*) (citing *Walton*). This

Court's *McHam* opinion specifically refers to the *Morgan* discussion of the relationship between self-defense and heat-of-passion manslaughter (quoted herein) as "an insightful discussion on this issue." *Id.*

**41.** 2001 OK CR 5, ¶ 48, 21 P.3d at 1067.

**42.** *Id.* at ¶ 48 n. 17, 21 P.3d at 1067 n. 17.

**43.** *See* Majority Opinion, p. 925 n. 14 (agreeing with *Black* on this issue).

**44.** The analysis and instruction I am offering would apply only to a defendant who actually relies upon heat-of-passion manslaughter as his defense, *i.e.*, to a defendant who does not contest the fact that he killed the victim, but who maintains that the killing constituted first-degree manslaughter. While such a defendant could also logically assert that the killing was in self-defense (if there was some evidence to support this claim), a defendant who does not acknowledge responsibility for the killing would not be entitled to an instruction on this defense—though he or she could be entitled to an instruction on manslaughter as a lesser offense.

**45.** "Duress" is limited in this context to a reasonable belief that one is in "imminent danger of death or great bodily harm from another." *See* OUJI–CR2d 8–20.

fense."[46] Although such a defense diminishes the extent of the defendant's criminal liability, it does *not* absolve the defendant of criminal liability. Rather, this partial defense suggests that the defendant should be convicted of a separate, lesser crime.

¶ 17 Therefore, an Oklahoma jury should be required to consider this defense, when it is properly raised, but a finding that it applies would result in a conviction on the lesser offense of first-degree manslaughter rather than simply an acquittal. I suggest that when a defendant charged with malice-aforethought murder asserts heat-of-passion manslaughter as a defense and some evidence is presented at trial in support of the defense, the jury should be instructed regarding the availability of this defense and the State's burden to disprove it. Such an instruction (or instructions) could state as follows:

> Evidence has been introduced that the killing in this case constitutes first-degree (heat-of-passion) manslaughter, as a defense to the charge of first-degree murder.[47]

> You are instructed that you must first consider whether the defendant committed the crime of first-degree manslaughter, as defined in these instructions. If you unanimously agree that the evidence presented establishes, beyond a reasonable doubt, that the defendant committed the crime of first-degree manslaughter, you should convict him of first-degree manslaughter.

> You are further instructed that in order to convict the defendant of first-degree murder, the State must prove, beyond a reasonable doubt, that **he/she** did not commit first-degree manslaughter. If you unanimously agree that the defendant did not commit the crime of first-degree man-

slaughter, you should then consider whether **he/she** committed the crime of first-degree murder, as defined in these instructions.[48]

It is my belief that we should stop making excuses for the failure to give such an instruction, stop contorting the English language to rationalize our failure to require one, and start requiring that such an instruction be given.

¶ 18 I would conclude that Hogan should prevail on his Proposition I claim, by finding that the trial court committed plain error and violated Due Process when it failed to instruct Hogan's jury regarding his affirmative defense and the State's burden to disprove it. This conclusion follows from the Supreme Court's decision in *Mullaney* and our Court's decision in *McCormick*, as well as our well-established approach to the treatment of affirmative defenses. This conclusion is also consistent with the Tenth Circuit Court's decisions in *Lofton* and *Davis*.[49]

¶ 19 I recognize the irony of granting Hogan a further retrial on a claim that seems only one step removed from the error that led to his first retrial, particularly when Hogan did not object to the court's instructions or propose an instruction of the sort he now maintains was required. Nevertheless, the lesson of *Black* is that when this Court strains to uphold a conviction, despite a trial court's inadequate instructions to the defendant's jury, the same inadequate instructions will continue to be given in other cases. And this Court will again be faced with the same issue in another hard case, in another appeal.

¶ 20 In Proposition V, Hogan challenges the trial court's refusal to instruct his jury regarding the "exculpatory statement doctrine." The uniform instruction sought by

---

46. Such a defense could also be described as an "imperfect defense" or "mitigating defense." *See Morgan*, 1975 OK CR 89, ¶ 5, 536 P.2d at 954 (contrasting "perfect defense" of self-defense with "imperfect defense" of voluntary manslaughter); OUJI–CR2d 8–36 (Committee Comments) (contrasting "exculpating defense" of insanity with "mitigating defense" of voluntary intoxication).

47. In a case involving multiple victims, the name of the victim (or victims) about which some evi-

dence supported the heat-of-passion defense could be inserted for clarification purposes.

48. In cases where this instruction was given, the jury would not be instructed under the lesser included offense instructions, namely, OUJI–CR2d 10–23 and 10–24.

49. Although the decisions of the Tenth Circuit Court of Appeals are not binding upon this Court, they are instructive and well-reasoned on this issue.

Hogan would have instructed his jury: "Where the State introduces in connection with a confession or admission of a defendant an exculpatory statement which, if true, would entitle **him/her** to an acquittal, **he/she** must be acquitted unless such exculpatory statement has been disproved or shown to be false by other evidence in the case." [50] The majority opinion rejects this claim as follows: "The trial court did not abuse its discretion in refusing to give a jury instruction on exculpatory statements because Hogan's statement to the police was disproved by other evidence in the case." [51]

¶ 21 Although I would be willing to agree with a specific finding that Hogan's statement to the police was not truly "exculpatory," as that term is defined in our uniform instruction,[52] I cannot agree with the Court's implicit finding that we can disregard the evidentiary significance of the defendant's own words where "other evidence" "disproved" what he said. Hogan was granted habeas relief from the 10th Circuit regarding his original conviction because, in essence, this Court declined to properly consider whether Hogan's statements were sufficient to warrant a jury instruction on heat-of-passion manslaughter.[53] We should not make a parallel mistake or misstatement in this round. If Hogan's statement was actually exculpatory, he would have been entitled to the exculpatory statement instruction, regardless of the "other evidence in the case." I do not believe that Hogan's statement was

exculpatory, yet I am not comfortable with the majority opinion's analysis.

¶ 22 I also disagree with the majority opinion's resolution of Hogan's Proposition VI marital privilege claim. In my judgment the theoretical and policy bases for protecting spousal communications—family harmony, affection, confidence, and loyalty within the marital relationship—are as valid today as they were 300 years ago. We ought not force or permit one spouse to testify against the other regarding a "confidential communication" between them, and Oklahoma's current Evidence Code continues to protect such communications.[54]

¶ 23 Here Hogan contrived a story and asked his wife to lie by repeating it. The majority opinion's analysis conflates the contrived story with the request to lie and concludes that the privilege was waived, because the (false) story was intended to be and was disclosed. Of course it is true that Hogan did not intend that his wife keep the contents of the concocted story "confidential," since he asked his wife to tell the story in order to provide him with an alibi. That was the whole point. But the "confidential communication" at issue is Hogan's admission to his wife that the story he was asking her to recount was untrue. I would hold that Hogan should have been allowed to prevent his wife from testifying that Hogan acknowledged to her that the alibi story was a lie and that he asked her to tell this lie to police.

¶ 24 In Proposition VIII, Hogan argues that because his original jury rejected the

**50.** *See* OUJI–CR2d 9–15.

**51.** *See* Majority Opinion, p. 926 (citation omitted).

**52.** *See* OUJI–CR2d 9–15 (defining "exculpatory statement" as "a statement by the defendant that tends to clear a defendant from alleged guilt, ... which, if true, would entitle him/her to an acquittal").

**53.** *See Hogan v. Gibson*, 197 F.3d 1297, 1306 (10th Cir.1999) ("[T]he Oklahoma Court of Criminal Appeals engaged in the wrong inquiry—asking on rehearing whether Hogan's self-defense instruction constituted a lesser included instruction, or initially whether the evidence was sufficient to support conviction on the greater charger, but *never* engaging in the correct inqui-

ry as to whether Hogan presented sufficient evidence to warrant a first-degree manslaughter instruction." (emphasis in original)). I dissented from this Court's original *Hogan* decision on this basis. *See Hogan*, 877 P.2d at 1166–67 (Chapel, J., dissenting) ("It may be that the jury would have found Hogan to be guilty of First Degree Murder even if they had been provided with a manslaughter instruction. However, that is not the test. The test is whether there is *some* evidence reasonably suggesting that the lesser-included offense instructions are warranted. Hogan's confession clearly provides *some* evidence of manslaughter." (emphasis in original)).

**54.** *See* 12 O.S.2001, § 2504(B) ("An accused in a criminal proceeding has a privilege to prevent his spouse from testifying as to any confidential communication between the accused and the spouse.").

"continuing threat" aggravating circumstance, it violated Double Jeopardy to allow the State to re-pursue this aggravator in the second stage of the retrial of this case. Hogan argues that he was effectively "acquitted" of the continuing threat aggravator; hence the State should not have been allowed to try him again on this same aggravator. I conclude that Hogan is correct. Recent authority from the United States Supreme Court strongly suggests that it *does* violate Double Jeopardy to allow the State to re-pursue an aggravating circumstance that was rejected by a prior capital jury in the same case. Furthermore, a broader understanding of Double Jeopardy in the context of a capital sentencing is consistent with the approach taken by this Court until up until 1996.

¶ 25 The majority's analysis is based upon *Poland v. Arizona.*[55] In *Poland,* the Supreme Court ruled that it did not violate Double Jeopardy to allow the State to go back and try again to get a death penalty verdict, even though it was determined on appeal that the only aggravating circumstance found by the original factfinder was not supported by sufficient evidence—as long as other evidence in the record supported a separate aggravator.[56] I acknowledge that the analysis of the majority opinion in *Poland* is contrary to Hogan's claim on appeal. Hence Hogan can prevail upon his Proposition VIII claim only if this Court agrees that we should no longer follow *Poland.*

¶ 26 I begin by noting that this Court did *not* immediately adopt the narrow understanding of Double Jeopardy represented by *Poland.* In fact, this Court maintained a broader approach to capital-stage Double Jeopardy—and an approach directly contrary to *Poland*—for nine and one-half years after the Supreme Court's 1986 decision in *Poland.* In our 1992 decision in *Crawford v. State,*[57] in an opinion by Judge Lumpkin, this Court held that where the sole aggravating circumstance found by the jury was not supported by sufficient evidence, we were required to remand the case for resentencing, where the only punishments that could be considered were life and life without parole.[58]

¶ 27 This Court concluded in *Crawford:*

Having found that the evidence does not support the sole aggravating circumstance found by the jury, we have no alternative but to REMAND THE CASE FOR A NEW TRIAL ON SENTENCING.... Since the remand for resentencing is due to insufficiency of the evidence to support the aggravating circumstance, the sentencing options at resentencing are limited to imprisonment for life or life without parole.[59]

We did not consider or discuss whether other aggravating circumstances could have applied to the murder in *Crawford.* Hence we did not take the approach outlined by the Supreme Court in *Poland.*

¶ 28 This Court continued to take the approach of *Crawford* up through our 1995 decisions in *Perry v. State*[60] and *Cheney v. State.*[61] In *Perry,* after finding that the evidence was insufficient to support either of

55. 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986).

56. *Id.* at 156–57, 106 S.Ct. at 1756 (where record evidence supported non-found aggravating circumstance(s), defendant had not been "acquitted" of death penalty, for Double Jeopardy purposes, and State could re-pursue death penalty).

57. 1992 OK CR 62, 840 P.2d 627.

58. *Id.* at ¶ 71, 840 P.2d at 641.

59. *Id.* at ¶ 85, 840 P.2d at 643. The *Crawford* Court relied upon 21 O.S.Supp.1985, § 701.13 (governing this Court's review of death sentences), and 21 O.S.Supp.1989, § 701.10a (governing sentencing proceedings on remand after death sentence has been overturned). *See* 1992 OK CR 62, ¶ 71, 840 P.2d at 641. Section 701.13 remains exactly the same today. *See* 21 O.S.2001, § 701.13. Section 701.10a was amended in 1993, to clearly establish a defendant's right to jury sentencing in any resentencing, as long as the original sentencing was by a jury. *See* 21 O.S.2001, § 701.101a(1). Under the prior provision, the defendant had no right to a jury sentencing if the death penalty was not at issue on resentencing. *See* 21 O.S.Supp.1989, § 701.10a(1)(a). Hence there has been no change in our statutory law that can explain this Court's subsequent decision to reject the approach of *Crawford.*

60. 1995 OK CR 20, 893 P.2d 521.

61. 1995 OK CR 72, 909 P.2d 74.

the two aggravating circumstances found by the jury,[62] this Court held that it was required to modify the defendant's sentence to life imprisonment without parole, without any discussion or consideration of allowing the State to re-pursue the death penalty.[63] We concluded, "Because the evidence will not support the two charged aggravating circumstances, we find that Perry's sentence of death must be vacated and modified to life without the possibility of parole." [64] Similarly, in *Cheney*, after finding that the sole aggravating circumstance found by the jury in that case was not adequately supported by the evidence, we again concluded that we were required to modify the defendant's sentence to life without parole.[65]

¶ 29 Consequently, over nine and one-half years after the Supreme Court's decision in *Poland*, this Court was still taking the position that if the evidence in the record was insufficient to support the aggravating circumstance(s) found by the jury in a particular case, the defendant had been effectively

"acquitted" of the death penalty; and the State would not be allowed to pursue it again in a resentencing.[66] In this consistent line of published cases, we did not even consider, as the Supreme Court did in *Poland*, whether there was other evidence in the record that could have been used to support a separate aggravator. If the evidence presented by the State was inadequate to sustain the aggravator(s) found in the previous capital sentencing, we did not allow the State another chance at the death penalty.[67]

¶ 30 This approach changed dramatically with this Court's 1996 decision in *Salazar v. State*.[68] In *Salazar*, we found that the sole aggravating circumstance found by the jury (on resentencing) was not supported by sufficient evidence.[69] This time, however, we cited and quoted extensively from the Supreme Court's *Poland* decision.[70] We then adopted the *Poland* approach as our own and applied it to the case on review.[71] We followed this same approach in *Frederick v. State*,[72] and

62. 1995 OK CR 20, ¶¶ 54–62, 893 P.2d at 533–36.

63. *Id.* at ¶ 64, 893 P.2d at 536–37.

64. *Id.* at ¶ 53, 893 P.2d at 533.

65. 1995 OK CR 72, ¶ 26, 909 P.2d at 83 ("[W]e find the evidence simply does not support the jury's finding that the murder of Mrs. Cheney was committed in an especially heinous, atrocious or cruel manner. Accordingly, Cheney's sentence of death must be modified to life imprisonment without the possibility of parole.").

66. *Poland* was decided on May 5, 1986; *Cheney* was decided on December 8, 1995.

67. On the other hand, we have consistently allowed the State to seek the death penalty upon resentencing when a death sentence is reversed for capital-stage errors not involving insufficient evidence.

68. 1996 OK CR 25, 919 P.2d 1120.

69. *Id.* at ¶ 12, 919 P.2d at 1125 (reversing "great risk of death to more than one person" aggravator).

70. *Id.* at ¶¶ 14–18, 919 P.2d at 1125–27. It should be noted that prior to the *Salazar* decision, in a case decided eleven days after *Cheney*, we did cite *Poland* approvingly. In *Romano v. State*, 1995 OK CR 74, ¶¶ 66–68, 909 P.2d 92, 117–18, we rejected the defendant's claim that State should have been collaterally estopped

from presenting evidence regarding an aggravator rejected by his original jury, where his original capital conviction was reversed for failure to sever from his co-defendant. This Court rejected Romano's claim as "moot," since the second jury, like the first, "rejected the aggravating circumstance of 'continuing threat.'" *Id.* at ¶ 68, 909 P.2d at 118. Nevertheless, we did cite *Poland* approvingly within our discussion of Romano's claim. *See id.* at ¶ 67, 909 P.2d at 118.

71. This Court wrote:

We interpret *Poland* to hold that if either the trial court or a reviewing court finds that, after removal of any infirm factors, the residual evidence offered by the state at the sentencing proceeding will not support a death sentence, then the defendant has been acquitted of the death penalty and jeopardy precludes any further sentencing proceedings seeking a death verdict. However, if there is evidence which supports other statutory aggravating circumstances, the case may be remanded and a death verdict may be sought. . . .

*Salazar*, 1996 OK CR 25, ¶ 18, 919 P.2d 1120, 1127. We then concluded that evidence in the record supported two aggravating circumstances that Salazar's resentencing jury had declined to find. Hence we remanded the case for a further resentencing, in which the death penalty could be pursued. *Id.* at ¶ 19, 919 P.2d at 1127.

72. 2001 OK CR 34, ¶¶ 108–10, 37 P.3d 908, 938 (citing and following both *Poland* and *Salazar*).

we have continued to follow *Poland* since 1996.[73]

¶ 31 I maintain, however, that the United States Supreme Court, through the still-unfolding *Apprendi/Ring* Revolution, has rejected the doctrinal basis for its decision in *Poland*. The *Poland* decision was inconsistent with the Supreme Court's preceding and landmark decision in *Bullington v. Missouri*,[74] in which the Court noted that in the capital sentencing context, the State was only entitled to "one fair opportunity to offer whatever proof it could assemble."[75] And more importantly, it is inconsistent with the Supreme Court's current understanding of the jury's role in sentencing generally and in capital sentencing, in particular.

¶ 32 In *Ring v. Arizona*,[76] which evolved from the broader sentencing revolution begun in *Apprendi v. New Jersey*,[77] the Supreme Court recognized that because the capital sentencing process *is* analogous to the guilt stage of trial, many of the constitutional protections applicable to the determination of a defendant's guilt must be applied equally to the determination of whether a capital defendant should be sentenced to death. In particular, *Ring* held that "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' ... the Sixth Amendment requires that they be found by a jury."[78]

¶ 33 Thus in *Ring* the Supreme Court inaugurated its current approach to understanding aggravating circumstances as the "functional equivalent" of "elements of a greater offense," where the lesser offense is simply first-degree murder or "murder *simpliciter*," for which the death penalty is *not* an authorized punishment, and the greater offense is "murder plus one or more aggravating circumstances," for which the death penalty *is* an authorized punishment.[79] While this shift might seem mere semantics to some, in fact, the change is fundamental and quite significant.

¶ 34 This brings us to *Sattazahn v. Pennsylvania*.[80] The narrow holding in *Sattazahn* is not particularly striking—a 5–4 majority holds that where a capital-stage jury becomes "deadlocked" during its deliberations, this is not an "acquittal" on the death

73. *See Salazar v. State*, 1998 OK CR 70, ¶ 7, 973 P.2d 315, 321 (noting that despite *Crawford, Perry*, and *Cheney*, "[t]he Court's analysis and application of *Poland* in *Salazar* ... represents this Court's current position on this issue").

74. 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981).

75. *Id.* at 446, 101 S.Ct. at 1862 (citation omitted). In *Bullington*, the Supreme Court held that Double Jeopardy protected a defendant who had been "acquitted" of the death penalty by a jury from having to face it again upon retrial: "Because the sentencing proceeding at petitioner's first trial was like the trial on the question of guilt or innocence, the protection afforded by the Double Jeopardy Clause to one acquitted by a jury is also available to him, with respect to the death penalty, at his retrial." *Id.* The Court cited *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), as articulating the idea of having "the slate wiped clean" on a retrial, such that a defendant would be subject to any legally authorized punishment upon retrial. 451 U.S. at 441–42, 101 S.Ct. at 1859–60 (quoting *Pearce*, 395 U.S. at 721, 89 S.Ct. at 2078). The *Bullington* Court emphasized, however, that "the 'clean slate' rationale recognized in *Pearce* is *inapplicable* whenever a jury agrees or an appellate court decides that the prosecution has not proved its case." *Id.* at 443, 101 S.Ct. at

1860 (emphasis added). Hence the *Bullington* Court concluded: "Having received 'one fair opportunity to offer whatever proof it could assemble,' ... the State is not entitled to another." *Id.* at 446, 101 S.Ct. at 1862 (quoting *Burks v. U.S.*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978)). In *Arizona v. Rumsey*, 467 U.S. 203, 209–12, 104 S.Ct. 2305, 2309–11, 81 L.Ed.2d 164 (1984), the Supreme Court followed *Bullington* and held that even where an "acquittal on the death penalty" is based upon a trial court's misconstruction of a statute, Double Jeopardy forbids further pursuit of the death penalty upon remand of the case.

76. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

77. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

78. *Ring*, 536 U.S. at 609, 122 S.Ct. at 2443 (quoting and citing *Apprendi* ).

79. The decision in *Ring* was 7–2, with six justices joining the majority opinion and Justice Breyer concurring in the judgment. Only Justices O'Connor and Rehnquist dissented.

80. 537 U.S. 101, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003).

penalty.[81] Hence the State can re-pursue the death penalty in a resentencing or retrial in the same case.[82] Thus *Sattazahn* applies the same rule to capital-stage "hung juries" that the Court has consistently applied to hung juries in the guilt stage.[83]

¶ 35 "A closer look at the various *Sattazahn* opinions, however, reveals that at least six members of the current Supreme Court fundamentally disagree with the doctrinal basis for *Poland* and strongly suggests that these six justices would overturn *Poland* if presented with the same issue."[84] Justice Scalia wrote the majority opinion in *Sattazahn*.[85] The *Sattazahn* majority opinion acknowledges the decision in *Poland,* summarizes it, and notes that *Poland* "distinguished *Bullington* and *Rumsey*."[86] Yet a careful review of Part III of Scalia's (plurality) opinion, along with Ginsburg's dissent, reveals that a substantial majority of the justices now on the Court no longer view Double Jeopardy protections in the capital sentencing context in the narrow manner upon which *Poland* relied.

¶ 36 Section III begins by noting that "[w]hen *Bullington, Rumsey,* and *Poland* were decided, capital-sentencing proceedings were understood to be just that: *sentencing proceedings*."[87] And such "sentencing proceedings" were understood as different from trials "in a respect crucial for purposes of the Double Jeopardy Clause: They dealt only with the *sentence* to be imposed for the 'offence' of capital murder."[88] Hence the Court in this earlier era "continually tripped over the text of the Double Jeopardy Clause."[89]

¶ 37 Section III emphasizes however, that "recent developments," namely, *Apprendi* and *Ring,* "have illuminated this part of our jurisprudence."[90] Section III summarizes these landmark decisions and their expanded view of the Sixth Amendment's jury-trial guarantee.[91] It continues:

> We can think of no principled reason to distinguish, in this context, between what constitutes an offense for purposes of the Sixth Amendment's jury-trial guarantee and what constitutes an "offence" for purposes of the Fifth Amendment's Double Jeopardy Clause ... In the post-*Ring* world, the Double Jeopardy Clause can, and must, apply to some capital-sentencing proceedings consistent with the text of the Fifth Amendment.[92]

And Section III clearly concludes that a jury's findings on aggravating circumstances *are* like minitrials on separate offenses, where the guilt-stage verdict is for the lesser offense of "murder *simpliciter*," and the second stage involves a trial on the greater offense of "murder plus one or more aggravating circumstances."[93] Thus Section III asserts, "If a jury unanimously concludes that a State has failed to meet its burden of proving the existence of one or more ag-

81. *Id.* at 109, 123 S.Ct. at 738.

82. *Id.* at 116, 123 S.Ct. at 742.

83. Hence a hung jury in either the guilt stage or the sentencing stage of a trial generally results in a "do over" for the State.

84. I am not counting Justices O'Connor and Rehnquist in this tally; nor am I making any prediction about how the Court's newest justices will vote.

85. Scalia's opinion was joined, *en toto*, by Justices Rehnquist and Thomas. Justices O'Connor and Kennedy joined all but Part III of the opinion. Justice Ginsburg wrote a dissenting opinion, joined by Justices Stevens, Souter, and Breyer.

86. 537 U.S. at 108–09, 123 S.Ct. at 738. It should be noted that *Poland*, unlike *Sattazahn*, did not involve a hung jury.

87. 537 U.S. at 110, 123 S.Ct. at 739 (emphasis in original).

88. *Id.* (emphasis in original)

89. *Id.* at 110–11, 123 S.Ct. at 739.

90. *Id.* at 111, 123 S.Ct. at 739.

91. Section III notes that in *Ring*, the Court held "that the Sixth Amendment requires that a jury, and not a judge, find the existence of any aggravating circumstances, and that they be found, not by a mere preponderance of the evidence, but beyond a reasonable doubt." *Id.* (citing *Ring*).

92. *Id.* at 111–12, 123 S.Ct. at 739–40.

93. *Id.* at 112, 123 S.Ct. at 740.

gravating circumstances, double-jeopardy protections attach to that 'acquittal' on the offense of 'murder plus aggravating circumstance(s).' "[94]

¶ 38 The *Sattazahn* dissenters would have gone even further, since they maintain that even the entry of a statutorily-mandated life sentence, when a jury cannot reach a verdict, should prevent the State from pursuing the death penalty in a retrial.[95] It must be noted, however, that the four dissenters agreed with Section III of Scalia's opinion that, in the post-*Ring* world, when a jury "acquits" a defendant on an aggravating circumstance, that aggravating circumstance cannot be pursued in any retrial or resentencing in the same case. The *Sattazahn* dissenters note: "This Court has determined ... that for purposes of the Double Jeopardy Clause, capital sentencing proceedings involving proof of one or more aggravating factors are to be treated as trials of separate *offenses*, not mere sentencing proceedings."[96]

¶ 39 Therefore, a careful review of the various opinions in *Sattazahn* reveals that a strong majority of the Court's current members have rejected the view of capital sentencing upon which *Poland* is based. As today's majority emphasizes, *Poland* dismissed the claim that a capital-sentencing jury's failure to find a particular aggravating circumstance "constitutes an 'acquittal' of that circumstance for double jeopardy purposes."[97] The *Poland* Court emphasized that it was not prepared to "view the capital sentencing hearing as a set of minitrials on the existence of each aggravating circumstance," since aggravating circumstances "are not separate penalties or offenses."[98]

¶ 40 Yet as early as *Bullington* and as recently as *Ring* and *Sattazahn*, the Supreme Court has clearly announced that a capital sentencing is *not* merely a "sentencing proceeding." Rather, in many critical constitutional respects, a capital sentencing is, in fact, a "minitrial" or separate factual determination regarding the aggravating circumstance(s) alleged by the State. In particular, a capital sentencing is a minitrial on the offense of murder-plus-one-or-more-aggravating-circumstances, to which the protections of Double Jeopardy apply, just as they do in the context of the jury's first-stage verdict.[99]

¶ 41 It is my belief that the Supreme Court will overrule *Poland* when the issue of its enduring legitimacy is properly before the Court. It is also my belief that when a constitutional right as precious as the protection against Double Jeopardy is at issue, and when a man's very life is on the line, we need not and should not wait until the proper test case winds its way to the Supreme Court

---

94. *Id.* It could be argued that Oklahoma's current, capital-stage verdict forms—which instruct juries to simply check any aggravating circumstance(s) upon which the jurors unanimously agree—do not allow us to determine whether a jury's failure to find a particular aggravator was a unanimous rejection of that aggravator or not. Yet this Court has consistently described verdicts where an aggravator is unchecked as a "rejection" of the unchecked aggravator(s). *See, e.g., Davis v. State*, 2004 OK CR 36, ¶ 47 n. 8, 103 P.3d 70, 83 n. 8; *Dodd v. State*, 2004 OK CR 31, ¶ 91, ¶ 102, 100 P.3d 1017, 1044, 1047; *Lott v. State*, 2004 OK CR 27, ¶ 132, ¶ 176, 98 P.3d 318, 351, 359; *Johnson v. State*, 2004 OK CR 25, ¶ 3 n. 7, 95 P.3d 1099, 1101 n. 7; *Harris v. State*, 2004 OK CR 1, ¶ 60, 84 P.3d 731, 753; *Alverson v. State*, 1999 OK CR 21, ¶ 30, 983 P.2d 498, 511; *Patton v. State*, 1998 OK CR 66, ¶ 110, 973 P.2d 270, 299. And in no case has this Court interpreted a jury's failure to find an aggravator as a "hung jury," since without specific notice from a jury that it is "deadlocked," we have no basis for assuming that such is the case. I conclude that the most reasonable way to deal with an Oklahoma jury's failure to check an aggravating circumstance, at least in the short term, is to treat it as a unanimous rejection of that aggravator, which operates as an "acquittal" on that aggravator. Where it is entirely possible that the jury unanimously rejected the unchecked aggravator, I maintain that it violates Double Jeopardy to allow the State to re-pursue that aggravator in a subsequent retrial or resentencing.

95. *Id.* at 118, 123 S.Ct. at 743 (Ginsburg, J., dissenting).

96. *Id.* at 126 n. 6, 123 S.Ct. at 747 n. 6 (emphasis in original) (citing *Ring* and *Bullington* ).

97. *Poland*, 476 U.S. at 155, 106 S.Ct. at 1755.

98. *Id.* at 155–56, 106 S.Ct. at 1755.

99. And a capital defendant's guilt-stage murder conviction constitutes a "lesser included offense" in relation to the capital-stage determination regarding the "greater offense" of murder-plus-one-or-more-aggravators.

docket. The constitutional handwriting is on the wall. We should read it and announce that this Court will no longer follow *Poland.* We did not adopt *Poland* when it was first decided, and we remain free to reject *Poland* now.

¶ 42 At a minimum, this Court should not reach out to reaffirm the questionable analysis of *Poland* in a case that does not necessarily require us to do so. In *Brown v. Sanders,*[100] the Supreme Court recently announced that when a death penalty case involves a jury's consideration of an invalid aggravating circumstance, the focus of appellate review should be on whether the invalid "sentencing factor" allowed the jury to give "aggravating weight" to evidence that would not otherwise have been before it.[101] Because Hogan's retrial jury declined to find the "continuing threat" aggravating circumstance, under Oklahoma law, the jury should not have considered this aggravator (or the evidence presented to support it) within its determination about whether to sentence Hogan to death. Hence it could be argued that Hogan's current claim is moot.

¶ 43 In light of *Sanders*, however, it should be acknowledged that by alleging the continuing threat aggravator in Hogan's retrial, over defense objection, the State was allowed to present evidence during the retrial's sentencing phase that would *not* otherwise have been admissible—since the State's evidence would otherwise have been limited to evidence supporting the "heinous, atrocious, or cruel" aggravating circumstance. Thus the State's aggravating evidence should have been limited to evidence about the circumstances of Stanley's murder.

¶ 44 Because the State was allowed to pursue the continuing threat aggravator, however, it was allowed to present evidence that Hogan had committed burglaries in the Okla-

homa City and Moore area; that he shot out windows at a business from which he had been fired; that he threatened the family of a former business partner; and that he once molested an eleven-year-old neighbor girl. The majority opinion does not address any of this evidence or its significance. Yet none of this evidence could have been put before Hogan's jury if the State had been prevented, under the constitutional protection against Double Jeopardy, from re-pursuing the continuing threat aggravator.

¶ 45 I recognize that both juries that were presented this evidence rejected the continuing threat aggravator. After reviewing the actual evidence regarding each of these incidents, though certainly not flattering to Hogan, I understand why the juries declined to find this aggravator. Consequently, I could be comfortable with a conclusion by this Court that even though the State should not have been allowed to pursue the continuing threat aggravating circumstance, this constitutional error turned out to be harmless under the specific circumstances of this case.

¶ 46 Today's decision could have resolved Hogan's Proposition VIII claim by deciding that any Double Jeopardy violation was rendered moot by the resentencing jury's rejection of the continuing threat aggravator and/or by concluding that the admission of evidence in support of this aggravator was harmless beyond a reasonable doubt. I would prefer that today's decision had taken such an approach, rather than relying on the constitutionally unstable foundation of *Poland.*

¶ 47 For the reasons articulated herein, I dissent from today's decision.

LUMPKIN, V.P.J.: Concur in Results:

¶ 1 In concur in the affirmance of the judgment and sentence in this case. I write

---

**100.** —— U.S. ——, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006).

**101.** *Id.* at 892 ("An invalidated sentencing factor ... will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." (emphasis in original) (footnote omitted)). The *Sanders* case sought to

change the different appellate rules governing "weighing States," such as Oklahoma, in which the jury is limited in its decision about whether *to impose the death penalty to the specific* aggravating circumstances (or "eligibility factors") found as part of the jury's eligibility determination, and non-weighing states, in which the jury's ultimate determination about whether to impose the death penalty is not limited in this way. *Id.* at 889–91.

separately to note that as stated in my separate writing to *Hanes v. State,* 973 P.2d 330, 338 (Okl.Cr.1998) this Court has previously reviewed mixed questions of law and fact based upon an abuse of discretion standard, asking whether the trial court's findings of fact are supported by the record, and not a *de novo* review. However, based upon *stare decisis* I agree with the Court's resolution of the claim of ineffective assistance of counsel.

¶ 2 Additionally, in Proposition XIII, Appellant's mere listing of issues for this Court to consider is insufficient to invoke appellate review. I find Appellant has waived appellate review as he has not provided any argument or authority as to why this Court should reconsider it prior rulings on six different issues. *See* Rule 3.5C, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2001). *See also Romano v. State,* 1995 OK CR 74, ¶ 65, 909 P.2d 92, 117.

### ORDER GRANTING REHEARING BUT DENYING RECALL OF THE MANDATE

¶ 1 Appellant filed a Petition for Rehearing and Motion to Recall the Mandate in the above-styled appeal on June 5, 2006. He requests reconsideration of this Court's decision affirming his conviction for first-degree murder and sentence of death. *See Hogan v. State,* 2006 OK CR 19, 139 P.3d 907 (May 15, 2006).

¶ 2 "Petition for Rehearing shall not be filed as a matter of course, but only for two reasons:

1. Some question decisive of the case and duly submitted by the attorney of record has been overlooked by the Court, or

2. The decision is in conflict with an express statute or controlling decision to which the attention of this Court was not called either in the brief or in oral argument."

Rule 3.14, *Rules of the* Oklahoma *Court of Criminal Appeals,* Title 22, Ch.18, App. (2006).

¶ 3 In seeking rehearing, Appellant claims that this Court incorrectly decided the claims raised in Propositions I, II, III and VIII and the decision is in conflict with controlling authority. We disagree. The decision rendered in this case disposed of the issues raised relying upon appropriate authority and we deny rehearing on this basis.

¶ 4 Appellant also claims questions decisive of the case that were duly submitted were overlooked by the Court. The opinion does not address Appellant's claim that trial counsel was ineffective for failing to challenge the jury instructions submitting first degree manslaughter as a lesser included offense or the prosecutor's allegedly improper statements to the jury on intent to kill. Neither of these issues, however, is decisive and requires relief.

¶ 5 We held the jury instructions, when read as a whole, fairly and accurately stated the applicable law. *Hogan v. State,* 2006 OK CR 19, ¶ 44. Hogan, thus, cannot show that he was prejudiced by counsel's failure to object to the court's instructions and he cannot prevail. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Davis v. State,* 2005 OK CR 21, ¶ 7, 123 P.3d 243, 246. Nor do we find that the prosecutor's argument concerning intent to kill and how it can be formed erroneously instructed the jury on the issue of intent to kill. *Wackerly v. State,* 2000 OK CR 15, ¶¶ 29–30, 12 P.3d 1, 12.

¶ 6 The Petition for Rehearing is **GRANTED.** The Motion to Recall the Mandate is, however, **DENIED.**

¶ 7 **IT IS SO ORDERED.**

¶ 8 **WITNESS OUR HANDS AND THE SEAL OF THIS COURT** this 28th day of June, 2006.

/s/ Charles S. Chapel, Dissents
CHARLES S. CHAPEL, Presiding Judge

/s/ Gary L. Lumpkin
GARY L. LUMPKIN, Vice Presiding Judge

/s/ Charles A. Johnson
CHARLES A. JOHNSON, Judge

/s/ Arlene Johnson
ARLENE JOHNSON, Judge

/s/ David Lewis
DAVID LEWIS, Judge